IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES EUGENE BIGBY, | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| v. | § | No. 4:08-CV-765-Y |
| | § | **DEATH PENALTY CASE** |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

In 1991, Petitioner James Eugene Bigby[1] was convicted and sentenced to death for the murders of Michael Trekell, Trekell's son Jayson, Wesley Crane, and Frank Johnson.  In 2005, he was granted a new trial on punishment and was subsequently sentenced to death again.  Having spent several years pursuing his claims in state court, Bigby now challenges the validity of his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254.  However, Bigby fails to demonstrate that he is entitled to relief.  He does not show that the state courts unreasonably applied clearly-established federal law; nor does he

---

[1]    Respondent Rick Thaler will be referred to as "the Director."

overcome the state court's factual findings with clear and convincing evidence.

For these reasons, Bigby's bid for federal habeas relief should be denied.[2]

## BIGBY'S ALLEGATIONS

The Director understands Bigby to allege that:

(1)     he received ineffective assistance of counsel when his attorneys failed to adequately investigate and present mitigating evidence during the punishment phase of his trial (Claims 1 & 2)

(2)     he received ineffective assistance of counsel during voir dire because his attorneys' alleged failure to adequately investigate mitigating evidence hindered their ability to question the jurors (Claims 3(a)-(l));

(3)     the Texas death-penalty statute violates the Supreme Court's holding in *Apprendi v. New Jersey*[3] because it does not require the State prove the mitigation special issue beyond a reasonable doubt and because the indictment did not provide notice of the facts the State intended to prove to establish Bigby's eligibility for the death penalty (Claim 4);

(4)     the evidence presented at the punishment was legally insufficient to support the jury's finding that Bigby would constitute a future danger to society (Claim 5).

(5)     the Texas death-penalty statute allows jurors too much discretion and lacks the minimal standards and guidance necessary to prevent the arbitrary and capricious imposition of the death penalty (Claim 6);

---

[2]     The Director further denies all allegations of fact made by Bigby except those supported by the record and those specifically admitted herein.

[3]     530 U.S. 466, 476 (2000).

(6)     the mitigation special issue sends mixed signals to the jury,
        thereby rendering any verdict reached in response to that
        special issue intolerably unreliable (Claim 7); and

(7)     the Texas lethal-injection protocol constitutes cruel and
        unusual punishment (Claim 8).

Bigby also generally argues that he is entitled to a de novo review of his

claims because the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), which governs his petition, violates the separation-of-powers doctrine.

Lastly, he urges the Court to grant him an evidentiary hearing because the state

court's review "did not reliably find the facts after a full hearing."

## STATEMENT OF THE CASE

The State indicted Bigby for the capital murder of Michael Trekell and

Jayson Kehler committed during the same criminal transaction.  1 CR-01[4] 2-3;

*see* Tex. Penal Code Ann. § 19.03(a)(6) (West 1990).  On March 8, 1991, the jury

found Bigby guilty as charged in the indictment.  2 CR-01 471.  On March 12,

1991, after a separate punishment hearing, the jury answered affirmatively the

special issues submitted pursuant to Article 37.071 of the Texas Code of

---

[4]     The Director has submitted Bigby's state court records under separate
cover.  "CR-01, -02" refer to the respective Clerk's Records of pleadings and documents
filed during Bigby's trials.  "RR-01, -02" refer to the respective Reporter's Records of the
transcribed state trial proceedings.  "SHCR-01, -02" refer to the respective Clerk's
Records of pleadings and documents filed during Bigby's state habeas reviews.  All
references are preceded by volume number and followed by page number where
applicable.  "DE" refers to entries on this Court's electronic docket sheet, available on
PACER.

Criminal Procedure.  2 CR-01 524-526.  Accordingly, the trial court assessed Bigby's punishment at death.  The Court of Criminal Appeals affirmed the conviction and death sentence on direct appeal, and the Supreme Court denied Bigby's petition for writ of certiorari.  *Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. S1994), *cert. denied*, 515 U.S. 1162 (1995).  Bigby then filed a state application for writ of habeas corpus, which the Court of Criminal Appeals denied.  *Ex parte Bigby,* No. 34,970-01 (Tex. Crim. App. 1998).

Bigby filed a federal petition for writ of habeas corpus in the United States District Court for the Northern District of Texas, Fort Worth Division.  The district court denied Bigby's petition.  *Bigby v. Johnson*, No. 4:98-CV-00336 (N.D. Tex.) (DE 22, 23).  Nevertheless, the court granted Bigby a certificate of appealability on the sole question of "[w]hether Petitioner was denied the right to a trial presided over by a fair and impartial judge after he assaulted the state trial judge." *Id.* (DE 25).  Thereafter, all issues in the petition were fully briefed and oral argument was held before the Fifth Circuit in November 2000.  However, because of developing case law regarding Bigby's claim brought pursuant to *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*) and *Robertson v. Cockrell*, 325 F.3d 243 (5th Cir. 2003), the parties filed supplemental briefing.  On March 8, 2005, the Fifth Circuit affirmed Bigby's conviction but reversed the

district court's denial of his *Penry* claim and granted Bigby habeas corpus relief. *Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005).

Bigby was then re-tried on punishment and sentenced to death again. The Court of Criminal Appeals affirmed the sentence, and the Supreme Court subsequently denied certiorari review. *Bigby v. State*, 2008 WL 4531979 (Tex. Crim. App. 2008), *cert. denied* 129 S.Ct. 1984 (2009). While his direct appeal was pending, Bigby filed a state application for a post-conviction writ of habeas corpus. 1 SHCR-02 2. The trial court made findings and conclusions, and—after its own review of the record—the Court of Criminal Appeals entered an order adopting the trial court's findings and conclusions and denying the writ. *Ex parte Bigby*, No. 34,970-02 (Tex. Crim. App. Dec. 17, 2008) (Order) (unpublished) (per curiam). Bigby timely filed his federal petition on April 14, 2010. *Bigby v. Thaler*, No. 4:08-cv-00765-Y (DE 8, 9).

## STATEMENT OF FACTS

### I.    Facts of the Crime

Bigby was involved in a worker's compensation lawsuit against Frito-Lay. 27 RR-02 20-21. The lawsuit dominated Bigby's mind. *Id.* at 30, 48. He believed that Frito-Lay and the workers' compensation insurance company were conspiring against him to prevent payment of his claim. *Id.* at 21. He believed that his life was in danger, that people were following him and listening to his

conversations all the time, and that people were trying to kill him with poisonous green gas. *Id.* at 29, 45, 55, 88. Bigby eventually believed that friends from work, including his adult murder victims, were part of the conspiracy. 25 RR-02 63; 27 RR-02 46.

At about 6:00 p.m. on December 23, 1987, Bigby went to the Arlington home of his long-time friend Michael Trekell (Trekell), who was caring for his four-month-old son Jayson while his wife Grace Kehler (Kehler) was at work. 24 RR-02 159; 25 RR-02 62-63. Bigby and Trekell watched television, and Trekell prepared to cook the steaks that Bigby had brought for dinner. 24 RR-02 159; 25 RR-02 63. As Trekell sat at the kitchen table, Bigby pulled out a gun and shot Trekell in the head, severing Trekell's brain stem and causing his skull to collapse from multiple fractures. 24 RR-02 159; 25 RR-02 63; 26 RR-02 31-32. According to Bigby, he then suffocated Jayson with cellophane, filled the sink with water, and put Jayson face-down in the sink. 24 RR-02 159; 25 RR-02 63-64. The medical examiner testified that Jayson died from Bigby pushing the thrashing baby's head into the water for three to five minutes. 26 RR-02 34-36.

Kehler returned home in the early morning hours of December 24th to find Trekell lying on his back on the kitchen floor. 23 RR-02 29, 32-33. Thinking that Trekell was unconscious, she called 911 for help. *Id.* at 22. At the direction of the 911 operator, Kehler went to look for Jayson in his room, but he was not

there, and she feared that he had been kidnapped.  *Id.* at 33-34.  When Kehler turned around, she saw Jayson's body face down in the sink of water.  23 RR-02 34; 25 RR-02 33.  Kehler put Jayson's body on the bed, returned to the phone, and told the 911 operator that her son was dead.  23 RR-02 34.

Meanwhile, Bigby drove around and ended up at the Fort Worth apartment of his friend Wesley Crane (Crane) at about 11:45 p.m.  23 RR-02 137; 24 RR-02 159; 25 RR-02 64.  Crane and Bigby sat in the kitchen talking and reminiscing for over an hour.  23 RR-02 109-10.  Bigby told Crane that someone was following him and asked Crane to take him for a drive to figure out who it was.  *Id.* at 110, 116, 119.  They left the apartment at about 1:15 a.m.  *Id.* at 110-11, 118.  During the drive, Bigby pointed a gun at Crane and ordered him to stop and exit the truck.  24 RR-02 160; 25 RR-02 64.  Bigby the shot Crane in the forehead from not more than three feet away.  24 RR-02 160; 25 RR-02 64-65; 26 RR-02 14-15, 17.  Later, Crane's body was found lying in a pool of blood on a highway access road near his apartment complex.  23 RR-02 134, 145.

Bigby continued his murderous rampage at the Arlington home of another long-time friend, Frank Johnson.  When Bigby rang Johnson's doorbell at about 3:20 a.m. on December 24th, Johnson got up and answered the door.  *Id.* at 159.  Bigby described the ensuing events as follows:

> I don't remember if I rang the doorbell or knocked but [Johnson] answered the door.  He looked surprised that I was there and asked

what I was doing in [Crane's] truck.  I told him that I borrowed it from [Crane] to come and see him.  He asked me what I was doing with the shotgun and I told him I had brought it for him.  I then gave it to him.  What I mean by that is that I shot him first in the back and he fell to the ground.  I then shot him twice more, I believe one of the shots hit him in the stomach.

25 RR-02 65.  Upon hearing the gunshots, Johnson's wife got out of the bed and found Johnson lying on the ground in the doorway.  23 RR-02 160.

Johnson was pronounced dead at the hospital.  24 RR-02 41.  He was shot in the palmar aspect of his left hand, which was consistent with Johnson putting up his hand in a defensive motion, and he suffered cuts and abrasions when shattered bones flew from his hand.  26 RR-02 21.  The slug then entered under Johnson's chin and lodged at the back of his head.  *Id.* at 22.  Johnson was also shot in the chest, which pulverized his heart, fractured three ribs, and literally caused him to drop in his tracks.  *Id.* at 25.  The third shot, which was fired from no more than four feet away while Johnson was down, transected Johnson's spine, collapsed his vertebrae, and entered his liver.  *Id.* at 26.

The police initially suspected Kehler of killing Trekell and Jayson.  25 RR-02 35-36.  When Detective Tommy LeNoir (Detective LeNoir) asked Kehler about possible suspects, she implicated Bigby because he was the only person she could think of who might kill Trekell.  23 RR-02 36-38; 25 RR-02 37, 39.  Kehler recalled that Bigby had been visiting Trekell at the trailer that week while she worked the night shift.  23 RR-02 39; 25 RR-02 39.  Kehler told Detective LeNoir

about an occasion when Bigby talked about killing people at random and "going out in a blaze of glory."  23 RR-02 39, 50; 25 RR-02 39.

After Bigby became a suspect in Crane's murder, Detective Curtis Brannan (Detective Brannan) put out a broadcast over Tarrant County for all patrol officers to be on the lookout for Crane's missing truck.  24 RR-02 125-26; 168-69, 176.  An extensive manhunt ensued.  24 RR-02 129; 25 RR-02 46.

On December 26th, Bigby was found in room number 2 of the Vickery Motel in Fort Worth.  24 RR-02 44-45; 132-33.  The SWAT team and patrol officers surrounded the motel, and a detective trained in hostage negotiations was called to try to conduct a face-to-face negotiation with Bigby, who was holed up in his room.  *Id.* at 66-69, 71, 73, 132, 135.  When Bigby finally opened the door, he told the negotiator, "I'm guilty, and you know it."  *Id.* at 81.  Bigby was eventually taken into custody without incident.  *Id.* at 84.  He was immediately taken to the hospital because an officer thought that he saw Bigby take a large number of pills before exiting the motel room.  *Id.* at 85, 97, 110, 137-38, 184.

After Bigby's release from the hospital, Detective Brannan took him to the police homicide office.  *Id.* at 145.  When Detective Brannan confronted Bigby about the murders, he immediately said, "I did it, but I don't know why I did the baby."  24 RR 149.  Bigby said that he committed the murders because he thought that Trekell, Crane, and Johnson had conspired against him and had

tried to undermine his workers' compensation lawsuit against Frito-Lay. *Id.* at 197, 199. Bigby signed a written statement detailing the murders. *Id.* at 150-61. During the entire interview, Bigby was matter-of-fact, cold, without remorse, and laughed several times when discussing the murders. *Id.* at 162, 164, 213, 225-26.

After talking to Detective Brannan, Bigby gave another written statement to Detective LeNoir. 25 RR-02 49, 57-66. Again, Bigby's demeanor was very matter-of-fact, without emotion or remorse, and calloused. *Id.* at 67. When Detective LeNoir asked Bigby why he killed the baby, Bigby snickered and said that he did not know. *Id.* at 68. Bigby smirked and was amused when he pointed out the gun that he used in Trekell's murder; he laughed when discussing the sarcastic manner in which he told Johnson that he had brought the gun for him and the shot him; and he was amused by Johnson's question about why Bigby was driving Crane's truck and laughed when he said that he borrowed it to go see Johnson. *Id.* at 69-70.

When the police searched Bigby's motel room, they recovered several firearms, numerous rounds of ammunition, a holster, blasting caps, a tool kit of the type used by professional car thieves, and various prescription medications. 24 RR-02 220-41.

Bigby was tried for capital murder in 1991 for the deaths of Trekell and

Jayson. During a break in the proceedings, Bigby managed to retrieve a gun from Judge Don Leonard's bench and made his way into the judge's chambers. 26 RR-02 60, 70. Bigby aimed the gun at Judge Leonard and said, "Let's go, Judge." *Id.* at 60, 77, 100. A struggle ensued, and Bigby was eventually subdued. *Id.* at 78-80, 101. Judge Leonard thought that Bigby intended to use him to get away and then kill him. *Id.* at 84.

Prior to the murders, Bigby was hospitalized three times between September 16, 1986, and December 11, 1987, for psychiatric treatment. His first admission was at St. Joseph's Hospital from September 16th to October 29, 1986. 27 RR-02 123. Dr. Harold Eudaly initially diagnosed Bigby as having "acute schizoaffective disorder." *Id.* Bigby had hallucinations of green gas in certain places and believed that someone was trying to kill him. *Id.* at 126-28. Bigby told Dr. Eudaly that about thirty investigators were following him in connection with his workers' compensation claim. *Id.* at 128. Bigby admitted past drug use. *Id.* at 129. A registered nurse reported that Bigby talked at great length about his treatment by the company he worked for and expressed possible paranoid ideation about the company listening to his phone calls, talking to lawyers so that no one would take his case, and causing his wife to leave him. *Id.* at 133.

Bigby was next hospitalized at CPC Oakbend Hospital from July 2nd until

October 18, 1987, because his depression was increasing.  27 RR-02 14-37.  Bigby talked about Frito-Lay, the loss of his job, his wife's miscarriage, his wife leaving him, and private investigators trying to kill him and watching him.  27 RR-02 140.  During his stay at Oakbend, Bigby had to be taken to the gymnasium for recreation in order to take out his aggression on a punching bag or by throwing basketballs.  *Id.* at 112-13.  A social worker's report concluded that Bigby felt helpless and hopeless about his life situation, experienced many delusional thoughts about his ex-employer, and had paranoid thought processes that added to his depression.  *Id.* at 142.  Bigby's discharge diagnosis was major depressive disorder with melancholia (Axis I), passive/aggressive personality with antisocial traits (Axis II), and headache of unknown origin (Axis III).  *Id.* at 165.

On the third occasion, Bigby was admitted to St. Joseph's Hospital on December 1, 1987, so that Dr. Eudaly could administer a course of electroshock treatment.  *Id.* at 145-46.  A nursing assessment stated that Bigby was possibly suicidal and suffered from delusions and hallucinations.  27 RR-02 152-53.  Due to staff mistakes, Bigby walked out of the hospital on December 11, 1987, and refused Dr. Eudaly's requests to return.  *Id.* at 149-50, 153.  Bigby's discharge summary showed that Bigby had major depressive disorder, no delusions or hallucinations, and concrete but otherwise logical thinking.  *Id.* at 167.

Psychiatrists who evaluated Bigby on behalf of the defense after the

murders diagnosed Bigby as a paranoid schizophrenic.  27 RR-02 221-22, 245; 28 RR-02 23-24.  They testified that Bigby was insane when he committed the murders, that he suffered from delusions and hallucinations, and that he committed the murders because he believed that his friends were part of a conspiracy concerning his lawsuit with Frito-Lay.  27 RR-02 223-24; 230-231; 28 RR-02 26-29, 74.

On the other hand, the State presented evidence that Bigby was not a paranoid schizophrenic and that any psychiatric problems he suffered resulted from amphetamine abuse, depression, and/or personality traits.  Bigby's own experts acknowledged that amphetamine abuse could cause delusions and hallucinations.  28 RR-02 10-11, 63-66; 29 RR-02 247.  Dr. James P. Grigson testified that delusions after amphetamine use can last for over a year and that he has seen people with amphetamine psychosis commit these types of acts.  28 RR-02 63, 66.  Bigby admitted that he used amphetamine on the night of the murders.  *Id*. at 11, 27.  Dr. Lisa Clayton, a forensic psychiatrist called by the defense, acknowledged that amphetamine abuse can lead to psychotic behavior characterized by intense paranoia, hallucinations, and out-of-control rages that can be coupled with extremely violent behavior.  29 RR-02 247.  The DSM-IV states that diagnosis of schizophrenia is inappropriate if the signs and symptoms are due to direct psychological effects of substance abuse.  *Id*. at 247.

Psychological tests administered to Bigby by Dr. Koechel in late September 1986—well before the murders—resulted in a diagnosis of anxiety disorder (Axis I) and passive-aggressive personality with prominent antisocial traits (Axis III).  27 RR-02 162-63.  Dr. Eudaly, the psychiatrist responsible for Bigby's three hospital admissions before the murders, testified that he mainly treated Bigby for major depression; he never diagnosed Bigby as being schizophrenic.  *Id.* at 167.  He acknowledged that chronic abuse of amphetamine can lead to psychotic behavior, intense paranoia, hallucinations, and out-of-control rages couple with extreme violent behavior.  *Id.* at 157.

Dr. Richard Coons, a psychiatrist who examined Bigby at the State's request, testified that Bigby did not suffer from paranoid schizophrenia; rather, Bigby had either methamphetamine-induced psychotic delusions or delusional disorder.  32 RR-02 55-56.  Dr. Coons absolutely disagreed with the defense psychiatrists' diagnoses of schizophrenia.  *Id.* at 106.  He pointed out that none of Bigby's mental-health providers before the murders diagnosed Bigby as a paranoid schizophrenic.  *Id.* at 60-63.  In fact, Bigby's diagnoses before the murders were major depressive disorder (Dr. Eudaly) and recurrent major depression and prominent antisocial traits (Dr. Koechel).  *Id.* at 61-63.  The psychiatrist who evaluated Bigby after his escape attempt during the first trial diagnosed Bigby as having mixed personality disorder; he did not detect

schizophrenia.  *Id.* at 64.

Dr. Coons concluded that Bigby was sane when he committed the murders and that Bigby's psychotic behaviors, delusions, paranoia, and depression resulted from his methamphetamine use.  *Id.* at 53-54, 76-78.  When Dr. Coons talked to Dr. Eudaly in July 2006, Dr. Eudaly did not recall knowing about Bigby's amphetamine abuse; however, he acknowledged that amphetamine could produce the clinical symptoms he saw could account form Bigby's depression and lack of response to antidepressant medication.  32 RR-02 61.

Clinical and forensic psychologist Jack Randall Price testified for the State that Bigby had a long-standing personality disorder, not a mental disorder. *Id.* at 173.  He had traits from several different personality disorder, especially antisocial, pyschopathic, paranoid, and narcissistic traits.  *Id.* at 173-74, 191.  He also had a history of amphetamine abuse and of being depressed when things in his life do not work out well.  *Id.* at 174.  In Dr. Price's opinion, Bigby was not a paranoid schizophrenic, and his problems could be explained by drug use.  *Id.* at 174-75.  According to Dr. Price, Bigby has two mental disorders—amphetamine abuse and depression—as well as the underlying personality disorder with antisocial, narcissistic, and paranoid traits.  *Id.* at 190-91.  Bigby's amphetamine abuse explains what others have described as being consistent with paranoid schizophrenia.  32 RR-02 191.

The jury heard extensive evidence about Bigby's criminal lifestyle and bad acts prior to the murders. Mike Bogart, a former associate of Bigby's in stealing cars and dealing drugs, testified that while Bigby worked for Frito-Lay, he discussed how to hurt himself for insurance money. *Id.* at 92. Bigby had paperwork showing how much money he would receive for various types of work-related injuries. *Id.* at 100. Bigby even considered cutting off a finger or a toe in order to maximize the amount that he would collect. *Id.* at 100. Bogart testified that Bigby must have "chickened out" because he claimed a back injury instead. *Id.* at 101. Bogart did not believe that there was ever anything wrong with Bigby's back.

A former neighbor of the Bigby's recalled an occasion when Bigby was sixteen or seventeen and she was four or five years old. 31 RR-02 77-78. Bigby sat her on a tool bench in his garage and then fondled and put his hands in her vagina. *Id.* at 77-78.

Bigby's ex-wife testified that he physically attacked her on more than one occasion. 31 RR-02 120. After she and Bigby were separated, she found holes in the ceiling of various rooms in her home as if someone was going into the attic and looking down to see what she was doing. *Id.* at 21. She confronted Bigby, who admitted creating the holes so that he could keep an eye on her. *Id.* at 122.

Over the years, Bigby dealt and abused large amounts of

methamphetamine. 30 RR-02 75-76, 85, 106, 140, 143, 151; 31 RR-02 40, 87, 89, 105, 111, 117-18. He had an extensive history as a car thief. 30 RR-02 51-53, 63, 72-73, 88-89, 1010, 135-37, 148, 155-57; 31 RR-02 7, 9, 21-22, 88, 106. Sometimes he broke into and burglarized vehicles; sometimes he stole cars to strip and sell the parts; sometimes he took orders to steal particular types of vehicles. 30 RR-02 51-53, 72-73, 89, 101-02, 157; 31 RR-02 14, 21-22, 106. Bigby also engaged in credit-card and check fraud. 30 RR-02 139. He often recruited younger acquaintances, some of them in their teens, to aid him in his illegal activities. 30 RR-02 133-34, 145, 155-56; 31 RR-02 7, 21.

Bigby was known to seek revenge against people whom he believed had wronged him, and people were concerned about getting on his bad side. 30 RR-02 54-55, 138, 150, 158-59; 31 RR-02 1023-24. Bigby had a list of people whom he wanted to target because of grudges. 31 RR-02 32. Bigby once bragged that at any time he could kill five or six people before the authorities could catch him. 31 RR-02 35. One of his former accomplices in crime testified, "[Y]ou didn't do [Bigby] over. He got even with you. If you did him wrong, you looked over your shoulder every day. He was just that kind of guy." 30 RR-02 70.

## BRIEF IN SUPPORT

### I.   Standard of Review

#### A.   AEDPA

This petition is subject to review under the amendments to the federal habeas corpus statutes embodied in AEDPA.  *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997).  Under AEDPA, "[t]his Court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2) (West 2002)).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir. 2001).  Alternatively,

a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent from the Supreme Court's precedents but unreasonably applies it to the facts of a particular case. *Williams,* 529 U.S. at 407-09; *Hernandez*, 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. *Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir. 2001). In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams,* 529 U.S. at 410-11 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be

on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Moreover, pre-AEDPA precedent forecloses habeas relief if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

### B.   AEDPA does not violate the separation-of-powers doctrine.

The precedent above notwithstanding, Bigby asserts that AEDPA runs afoul of the separation-of-powers doctrine.  Petition at 9-15.  Consequently, he asks the Court to review the decision of the state court de novo for constitutional error rather than an unreasonable error of constitutional law.  *Id.* at 15.  However, Circuit and Supreme Court precedent is squarely against Bigby's argument.

The Fifth Circuit Court of Appeals has expressly stated that AEDPA does not violate the principle of separation of powers.  *See, e.g., Dufrene v. Brazoria County DA Office*, 146 Fed. Appx. 715, 717 (5th Cir. 2005); *Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir. 1999); *Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998).  As that Court has explained, AEDPA does not preclude Bigby from receiving a favorable result, nor do its provisions prohibit Bigby from filing required legal documents or having access to the courts.  *See, e.g., Dufrene*, 146 Fed. Appx. at 717.

Likewise, in *Plaut v. Spendthrift Farm, Inc.*, the Supreme Court makes clear the three actions by Congress can offend the separation-of-powers doctrine: (1) when Congress creates a statute that was said "[to] prescribe rules of decision to the Judicial Department of the government in cases pending before it;" (2) when Congress vests review of the decisions of Article III courts in officials of the

Executive Branch; and (3) when Congress retroactively commands the federal courts to reopen final judgments.  514 U.S. 211, 218-19 (1995).  Because none of these situations apply to AEDPA's mandated standard of review, Bigby does not show that  AEDPA violates the separation-of-powers doctrine.  *See also Felker v. Turpin*, 518 U.S. 651, 663-64 (1996) (declining to hold that the restrictions imposed in 28 U.S.C. § 2244 limit the Supreme Court with respect to its original jurisdiction for the Great Writ); *Turner v. Johnson*, 177 F.3d 390, 392-93 (5th Cir. 1999) (judgments about the proper scope of the writ are "normally for Congress to make.") (internal quotation and citation omitted).

## II.   Bigby Is Not Entitled to an Evidentiary Hearing on His Claims.

Bigby also asks the Court to hold an evidentiary hearing on his claims. Petition at 19-24.  But since an evidentiary hearing is barred under 28 U.S.C. § 2254(e)(2), the Court should deny Bigby's motion.

Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.   28 U.S.C. § 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show

by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  28 U.S.C. § 2254(e)(2)(B). The Supreme Court has held that under § 2254(e)(2), a habeas petitioner has not failed to develop the factual basis of a claim in state court unless there has been a lack of diligence, or some greater fault, on the part of the petitioner or petitioner's counsel.  *Williams*, 529 U.S. at 432.  The Court further stated that such diligence depends upon whether the petitioner made a reasonable attempt to investigate and pursue claims in state court.  *Id.* at 435.  Diligence will therefore require that a petitioner, at a minimum, seek an evidentiary hearing in state court and that the petitioner be diligent in developing the record and presenting, if possible, all claims of constitutional error.  *Id.* at 437.

Nevertheless, even if a petitioner has satisfied the requirements of § 2254(e)(2), he is not necessarily entitled to an evidentiary hearing. "[O]vercoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing; it merely opens the door for one[.]" *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000).  Federal law leaves "[t]he decision whether to conduct an evidentiary hearing . . . to the sound discretion of the district court[.]" *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000). "[W]here a district court has before it sufficient facts to make an informed decision regarding the merits of a claim, a district court does not abuse its

discretion in refusing to grant an evidentiary hearing (even where no factual findings are explicitly made by any state court)." *Murphy*, 205 F.3d at 816; *see also McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."); *Young v. Herring*, 938 F.2d 543, 560 n. 12 (5th Cir. 1991) ("[A] petitioner need not receive an evidentiary hearing if it would not develop material facts relevant to the constitutionality of his conviction.").

Furthermore, a petitioner is not entitled to an evidentiary hearing "if his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." *Young*, 938 F.2d at 559. "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." Rule 8 of the Rules Governing Section 2254 Cases. In deciding whether to grant a hearing, under Rule 8(a) of the Rules Governing Habeas Corpus Cases Under Section 2254, "the judge must review the answer [and] any transcripts and records of state-court proceedings to determine whether an evidentiary hearing is warranted." *Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir. 2008) (quoting *Schriro v. Landrigan*, 550 U.S .465, 473 (2007)).

Therefore, before granting petitioner's request for a hearing, the Court

must consider whether further factual development could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474.  Furthermore, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.* "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary  hearing." *Id.*

In the case-at-bar, Bigby contends that he is entitled to a hearing because the "the state trial court did not reliably find the facts after a full hearing." Petition at 23.  However, this is not the relevant standard.  Bigby cites to *Townsend v. Sain*, 373 U.S. 293, 312-13 (1963), for this proposition, but *Townsend* is a pre-AEDPA case and does not address the subsequent requirements of § 2254(e)(2).  Indeed, with respect to § 2254(e)(2), Bigby has plainly failed show either that his claims rely on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or his claims rely on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claims show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted Bigby.  28 U.S.C.

§ 2254(e)(2)(B).  Consequently, this Court should deny Bigby's request for an evidentiary hearing.[5]

## III.   Bigby Has Failed to Show that He Received Ineffective Assistance of Counsel.  (Claims 1 & 2)

In his first and second claims for relief, Bigby maintains that he received ineffective assistance of counsel at his punishment retrial because his attorneys failed to adequately investigate and present potentially mitigating evidence. Petition at 39-76.   Bigby further asserts that counsel relied on the same investigation and trial strategy as the defense team in Bigby's first trial and performed no new mitigation investigation.   *Id.*  Bigby argues that the defense team's investigation and strategy during the first trial was unsuccessful and a "rerun" of that presentation had no potential for success.  *Id.*  The state habeas court evaluated this claim and determined that Bigby had failed to show that

---

[5]     With regard to the factual allegations underlying this claim, Bigby complains that the state trial court acted too hastily in recommending the denial of his state habeas application and could not have possibly reviewed and evaluated all of the relevant documents in the time available. Petition at 20-24.  But the record shows that Bigby's petition was submitted on the January 4, 2008 (1 SHCR-02 2); the State had submitted the supplemental affidavits of counsel by August 18, 2008 (4 SHCR-02 850, 860); the state trial court ordered findings and conclusions on August 22, 2008; and the state trial court adopted the State's findings and conclusions on October 29, 2008 (SHCR 905).  Altogether almost nine months passed in which the case was pending, with reasonable increments of time between filings for the state trial court to evaluate and process the materials submitted to it.   Under Fifth Circuit precedent, these intervals were more than sufficient to provide a full and fair review.  *See e.g. Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (rejecting due process challenge to state habeas court's verbatim adoption of district attorney's proposed findings of fact and conclusions of law only three hours after they were filed with court).

counsel performed deficiently, and even if counsel had performed deficiently, Bigby was not prejudiced.  4 SHCR-02 887.  As shown below, Bigby has not shown that this decision was an unreasonable application of the law to the facts or contrary to clearly-established Supreme Court precedent.  Accordingly, this claim should be denied.

## A.    Standard of Review

The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  That is, to establish that counsel performed ineffectively, Bigby must show both that his attorney's performance was deficient and the deficient performance prejudiced his defense.  466 U.S. at 687.  Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *Id.* at 697.

In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  *Id.* at 687.  In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to

eliminate the "distorting effect of hindsight." *Id.* at 689.  To render effective assistance, the Sixth Amendment requires counsel "to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 691); *see Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985); *Martin v. Maggio*, 711 F.2d 1273, 1280 (1983). When assessing effectiveness at the sentencing stage of a capital trial, counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).  "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* That is, "[g]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Id.* Yet, *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003).

   With respect to counsel's duty to investigate, the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91; *see Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); *Lowenfield v. Phelps*, 817 F.2d 285, 290 (5th Cir. 1987).  When a petitioner argues that his counsel failed to adequately investigate mitigation evidence, the proper inquiry is "not whether counsel should have presented a mitigation case . .. [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 523 (emphasis in original).

The reasonableness of an attorney's investigation must be determined by considering not only the evidence already known to counsel, but also whether such evidence would lead a reasonable attorney to investigate further.  *Id.* at 527.  The reasonableness of an investigation depends in large part on the information supplied by the defendant.  *See Ransom*, 126 F.3d at 123; *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989); *Mattheson v. King,* 751 F.2d 1432, 1440 (5th Cir. 1985) (in denying ineffective-assistance claim based on failure to investigate and pursue insanity defense, court noted defendant's failure to tell

counsel that he either was presently insane or so intoxicated at time of offense as to be incapable of forming requisite intent). At a minimum, counsel should interview potential witnesses and independently investigate the facts and circumstances of the case. *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994).

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692. In order to establish that he has sustained prejudice, Bigby "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*; rather, Bigby must "affirmatively prove" prejudice. *Id.* at 693. Where counsel is alleged to have been ineffective at the punishment phase, the inquiry is whether the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Petitioner's] reduced moral culpability, death was not an appropriate sentence." *Neal*, 286 F.3d at 241.

Moreover, when a petitioner seeks a writ of habeas corpus based on ineffective assistance:

[i]t bears repeating that the test for federal habeas purposes is not whether [petitioner] made that showing. Instead, the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). Accordingly, to succeed in this Court on an ineffective-assistance-of-counsel claim, Bigby must at a minimum show that the state habeas court's decision was contrary to, or an unreasonable application of, the standards provided by the clearly-established federal law (*i.e.*, *Strickland*).

### B. Counsel did not perform deficiently.

In support of his claim that his attorneys performed ineffectively, Bigby has submitted the affidavit of Toni Knox, Bigby's mitigation specialist during his state habeas proceedings. Petition at 37, Exhibit No. 2. He also incorporates by reference documents submitted by Knox during Bigby's state habeas proceedings. *Id.* at 38. But with respect to these documents, the state habeas court found[6] that it could not determine the accuracy or reliability of Knox's assertions due to a lack of proper sourcing.[7] 4 SHCR-02 867. The state habeas

---

[6]   As noted in the Statement of the Case, *supra*, the finding and conclusions of the trial court were adopted by the Court of Criminal Appeals.

[7]   Counsel submitted affidavits during Bigby's state habeas proceeding and noted that no one from the Bigby's state habeas team ever contacted them about Bigby's claims. *Id.* at 869.

court further found that Knox's affidavit was rife with hearsay, particularly with respect to the medical records of Jerry Bigby, Bigby's brother, and the orphanage records of Trudy O'Neal, Bigby's half-sister.[8]  *Id.*

In rejecting Bigby's claim, the state habeas court noted that two qualified lawyers were appointed to represent Bigby—J. Warren St. John (St. John) and Wes Ball (Ball).  The state habeas court noted that both attorneys were licensed to practice in Texas, the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the Supreme Court of the United States.  *Id.* at 868.  Both attorneys were on the 11.071 list of counsel qualified to represent death-eligible defendants, and had each tried at least nine jury trials where the death penalty was sought and dozens of other trials where the death penalty was not sought.  *Id.*  They were both familiar with the issues present in capital murder trials—including mitigation and the use of mental-health professionals.  *Id.*  Ball had been board-certified in criminal law since 1985, and St. John had tried 146 felony jury trials and perfected over eighty state and federal appeals.  *Id.* at 868-69.

The state habeas court discussed counsel's strategy at length.  Counsel determined not to present evidence of Bigby's mental-health status at the time

---

[8]     These documents were referred to by Bigby and Knox, but never submitted to the State or the habeas court for review.  *Id.*

of trial because they feared it would produce testimony that he was a pyschopath. *Id.* at 872. Likewise, they made the reasonable strategic choice not to present evidence that Bigby was mentally ill following his first trial because they feared that it would lead Bigby to stop cooperating with counsel and cause him to engage in outbursts before the jury, thus undermining their argument that he was no longer a future danger based on his relatively benign behavior after his incarceration. 4 SHCR-02 872.

Counsel initially hired Shelli Schade as a mitigation specialist but eventually terminated her services. Bigby faults counsel for Schade's unsuccessful tenure as mitigation specialist, claiming that Schade could not obtain records from counsel or their mental health expert and that she had a "good relationship" with Bigby and "could have been of assistance to [Bigby]'s defense team." Petition at 43. But the state court found that, based on the affidavits of St. John and Ball, counsel's dealings with Schade did not constitute ineffective assistance of counsel. 4 SHCR 869. Counsel related in their affidavits that Schade failed to review records despite having access to them, was too busy with her other trials to devote the proper attention to Bigby's investigation, did not attend meetings with Bigby or the defense attorneys, would weigh in on mental health issues on which she was not qualified to speak, and did not have a good rapport with Bigby. *Id.* Bigby disputes this

characterization (Petition at 43), but the state habeas court's credibility determination is entitled to deference by this Court. *Kitchens v. Johnson*, 190 F.3d 698, 700-01 (5th Cir. 1999) (under the AEDPA, a state's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence).

In addition to Schade, defense counsel hired Dr. Kelly Goodness, a clinical and forensic psychologist.  4 SHCR-02 869.  She ultimately functioned as both consulting psychologist and mitigation expert.  Bigby claims counsel should not have allowed this dual role, but the state habeas court disagreed, noting that it was entirely permissible under ABA Guidelines. *Id.* at 870.  Counsel asked Goodness to focus her efforts on Bigby's mental state close to the time of the offense, which counsel had strategically decided to make the focus of their mitigation presentation (although they also asked her to tie in the relevant materials obtained throughout the years). *Id.*  The state habeas court concluded that this was a reasonable strategy.  *Id.* at 872.  Based on counsel and Goodness's affidavits, the state habeas court noted that Goodness: (1) analyzed voluminous records, including the entire original trial transcript, treatment records, and mental-health reports; (2) assisted counsel in understanding and best utilizing as mitigation the various opinion of mental-health professional; (3) provided a diagnosis of Bigby both at the time and at the time of his first trial;

(4) assisted counsel in understanding how Bigby's mental illness manifested at the time of the offense, how it manifested over time, and how it affected Bigby's choices and behavior; (5) provided multiple reports of her analyses; (6) educated counsel about the nuances of psychotic mental illnesses and why Bigby's case could be viewed differently by different mental-health examiners; and (7) conducted interviews, identified fact witnesses, and secured other experts to testify. *Id.* at 871. Dr. Goodness also had a rapport with Bigby and spoke to him at length. *Id.* at 871.

In addition to hiring and utilizing Dr. Goodness, counsel gathered and reviewed records from Bigby's first trial, discovery from the District Attorney, records from counsel (containing interviews with Bigby's family members), interviews of lay and expert witnesses, consultations with mental-health professionals, prison records, and many other documents. 4 SHCR-02 873. Ball and St. John also met with Larry Moore, Bigby's counsel during his first trial, to discuss the case.[9] *Id.* St. John also met with "Ms. O'Neal, Meredith Perry, and J. Means" (Bigby's relatives) for background information on Bigby—all of

---

[9]     Counsel also introduced the testimony of Moore, who stated that he believed Bigby was mentally ill, possibly schizophrenic, and was certainly not faking. 28 RR-02 131-39. Contrary to Bigby's assertion that the second trial was simply a rerun of the first, this evidence was not available during the first trial. Likewise, several lay witnesses testified to Bigby's religious conversion on death row. 28 RR-02 80-8890-100, 119-24. This information was also not available at the time of the first trial.

whom advised that they would not assist Bigby in any way. *Id.* Counsel obtained reports concerning Bigby's social history and attempted to discuss them with Bigby, but Bigby informed them that almost all of his relatives were deceased and that his favorite brother had died from brain cancer.[10] *Id.* at 873-74. The state habeas court also concluded that Bigby had failed to show any family members contacted by Bigby would have been willing to assist in his defense and would have testified at trial.[11] *Id.* at 874.

Bigby claims that counsel should have presented further evidence concerning his mother and his alleged abandonment issues. Petition at 47-53.

---

[10]     As noted earlier, the reasonableness of an investigation depends in large part on the information supplied by the defendant. *See Ransom*, 126 F.3d at 123.

[11]     To the extent that Bigby suggests that counsel should have called his brothers or other family members as witnesses, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)). Allegations that counsel failed to investigate and develop useful evidence are not sufficient to warrant a hearing or relief absent an "affirmative showing of what the missing evidence or testimony would have been" and an explanation "why it would have been likely to make any difference in his trial or sentencing." *Anderson v. Collins*, 18 F.3d 1208, 1220 (5th Cir. 1994). "A prisoner's bald conclusory assertion that supposed . . . witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.' " *Sayre*, 238 F.3d at 635 (quoting *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985)). Here, Bigby failed to present an affidavit or testimony in state court to inform the court what his brothers would have said on the stand.
    Furthermore, the presentation of witness testimony is essentially strategy and, thus, within trial counsel's domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one. *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984).

But counsel knew that Bigby's mother was an alcoholic and had abandoned her other children.  4 SHCR-02 875-76.  And contrary to Bigby's suggestions, the state habeas court found no credible evidence that Bigby's mother had consumed alcohol while pregnant with Bigby.  *Id.* at 876.[12]  Likewise, the state habeas court found that, while Bigby's siblings may have been abandoned or farmed out to other families, Bigby lived with his mother and had regular contact with his father.  *Id.* at 876.  Counsel knew that Bigby had a poor relationship with his mother, but they did not think that it would have made a difference to the jury. *Id.* at 876.  Nevertheless, at trial counsel introduced the prior testimony of Bigby's deceased father.  Bigby's father testified that: (1) he was separated from his wife in 1958; (2) as a child, Bigby lived with his mother; (3) Bigby's mother lost her leg in the 1970's; (4) at the time of Bigby's trial, Bigby's mother was in a nursing home because she was mentally incompetent and could not take care of herself; (5) Bigby's mother's half-sister "lost her mind" later in life and could not function; and (6) Bigby helped his mother with things that she could not do because of her disability.  4 SHCR-02 874; 27 RR-02 19, 24-26, 47, 56-57.

Counsel also knew that some of Bigby's relatives had mental-health issues, but under the facts of the case, they considered it unnecessary to present that

---

[12]     The court noted that Bigby had been tested for brain damage and none had been found.

evidence.  4 SHCR-02 877.  Counsel believed that evidence of a genetic predisposition towards mental illness could indeed be useful in validating a diagnosis rendered after a defendant committed a crime, but Bigby had a lengthy history of mental illness from both before and after the crime.  *Id.* at 877.  As such, introducing the evidence would have served no purpose and been redundant.  *Id.* at 877.  Counsel also believed that the State would just refute such testimony by pointing out that none of Bigby's family members had killed someone or drowned an infant in a sink.  *Id.* at 878.

In his petition, Bigby argues that counsel could have done more to secure a complete pyschosocial history for their client.  Petition at 53-59.  But the state habeas court concluded that there was no evidence that additional psychiatric records, if they existed, would have changed Bigby's diagnosis or have been useful in mitigation.  4 SHCR-02 878.  Bigby specifically complains that Dr. Clayton was not given an adequate pyschosocial history.  Petition at 57. However, Dr. Clayton's function at trial was to be a teaching expert and explain the prior diagnoses rendered by psychiatrists that had seen Bigby closer in time to the offense and who were now deceased.  4 SHCR-02 875.  She was not hired to make her own diagnosis and thus would not have been provided with such a report.  *Id.* at 875.

Bigby also argues that counsel's mitigation presentation was deficient because it lacked timelines, genealogy charts, and photographs. Petition at 62-69. But counsel did not believe that timelines nor genealogy charts would have assisted in the presentation of their case.[13] 4 SHCR-02 878. Likewise, the court found that counsel was not ineffective for failing to present photographs of Bigby to humanize him, noting that no photographs had been submitted during state habeas and any such photos would have simply been rebutted by the State's photographs of the murder victims. *Id.* at 880.

The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689-90; *Rector v. Johnson,* 120 F.3d 551, 563 (5th Cir. 1997); *Belyeu v. Scott*, 67 F.3d 535, 538, 540 (5th Cir. 1995). In evaluating counsel's investigation, a court must conduct an objective review measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688-89). A reviewing court must be also wary of "argument[s] [that] essentially come[] down to a matter of degrees. Did

---

[13]    *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources.").

counsel investigate enough?  Did counsel present enough mitigating evidence?

Those questions are even less susceptible to judicial second-guessing." *Kitchens*,

190 F.3d at 703.

Thus, under the facts set forth above, the state court acted reasonably

when it concluded that:

> Given all of the circumstances known to St. John and Ball at the time, trial counsel reasonably investigated all plausible options for [Bigby]'s mitigation case at the punishment retrial and/or made reasonable professional judgments supporting limitations on their investigation.  Counsel made reasonable strategic decisions about the most effective way to present [Bigby]'s mitigation case and made reasonable professional judgements that certain types of evidence would not assist or would be harmful to [Bigby]'s mitigation case. The investigation supporting trial counsel's decision not to introduce the evidence relied on by [Bigby] was reasonable, and known evidence would not have lead [sic] a reasonable attorney to investigate further.  All courses of conduct chosen by St. John and Ball at [Bigby]'s punishment retrial were "strategically designed to benefit" [Bigby].

4 SHCR-02 886.

### C.      But even assuming that counsel was deficient, no prejudice accrued as a result.

Even if the jury had learned more about Bigby there is no reasonable

likelihood that the outcome at punishment would have been different.  With

respect to errors at the sentencing phase of a death penalty trial, the relevant

inquiry is "whether there is a reasonable probability that, absent the errors, the

sentencer [] would have concluded that the balance of aggravating and

mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)).

Bigby's alleged mitigating evidence does not compare to the mitigating evidence the Supreme Court has found to be prejudicially omitted in other cases. In *Wiggins*, for example, counsel focused on Wiggins's direct responsibility for the murder, but asked the jury to also consider his "difficult life" during opening statement. But *no* evidence was presented as to Wiggins's life history. 539 U.S. at 526. And as the Court described, "[t]he mitigating evidence counsel failed to discover and present in this case is powerful[:]"

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities further augment this mitigation case.

*Id.* at 534-35; *see also id.* at 516-17, 525.

In *Rompilla v. Beard*, the case for mitigation was composed of the testimony of five family members who "argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was a good

man." 545 U.S. 474, 378 (2005).  But the evidence that was readily available to trial counsel included "a range of mitigation leads that no other source had opened up."  *Id.* at 390.  As the Court wrote:

> The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, [Pennsylvania]. vicinity.  He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out of [Pennsylvania], often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." . . .  The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. . . .  The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.

*Id.* at 390-91 (citations omitted).  Still other evidence established that Rompilla's mother drank during her pregnancy, that his father had a "vicious temper," that Rompilla and his siblings "lived in terror," that he and a brother were locked "in a small wire mesh dog pen that was filthy and excrement filled," that they were isolated from other children, that their home had no indoor plumbing, and that they slept in an attic with no heat.  *Id.* at 392.  Ultimately, the Supreme Court said of the later-discovered evidence, it "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury[.]" *Id.* at 393.

Furthermore, in assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial. The Fifth Circuit has indicated that it will look to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). For instance, the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 Fed. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989).

In the instant case, the record reflects that Bigby killed four individuals, including three of his friends and an infant. The record further reflects that Bigby suffocated the infant with cellophane and then drowned him in a sink. 24 RR-02 159; 25 RR-02 63-64. When Bigby was arrested, he confessed guilt. 24 RR-02 81. In his motel room, the police found a veritable arsenal of weapons. *Id.* at 220-41. Bigby gave written statements confirming his involvement, and

officers noted his cold, remorseless, emotionless demeanor, as well as inappropriate laughter.  24 RR-02 162, 164, 213, 225-26; 25 RR-02 67, 68. During Bigby's first trial, he managed to escape, steal a gun, and attempted to kidnap the presiding judge. 26 RR-02 60, 70, 77-80, 100-01.  The jury also heard one of Bigby's associates testify that Bigby had discussed faking an injury to get insurance money from Fritio-Lay and believed that Bigby had made up his back injury.  31 RR-02 100-01.  When Bigby was sixteen or seventeen, he sexually molested a four or five year-old girl.  *Id.* at 77-78.  Bigby physically attacked his wife on more than one occasion, and after their separation he put holes in the ceiling of various room in her house so that he could spy on her.  *Id.* at 120-22. Testimony also showed that Bigby dealt and abused a large amount of methamphetamine over the years.  30 RR-02 75-76, 85, 106, 140, 143, 151; 31 RR-02 40, 87, 89, 105, 11, 117-18.  Bigby had an extensive history as a car thief. 30 RR-02 51-53, 62, 72-73, 88-89, 101-02, 135-37, 148, 155-57; 31 RR-02 7, 9, 14, 21-22, 88, 106.  Bigby engaged in credit-card and check fraud.  30 RR-02 139. Bigby was well-known for seeking revenge against people who he believed had wronged him and had a list of people he wished to target. 31 RR-02 54-55, 138, 150, 158-59; 31 RR-02 10, 23-24, 32.  The State also presented testimony from four psychiatrists/psychologists that Bigby had delusions resulting from an

extensive history amphetamine abuse and that Bigby had antisocial personality traits.

When the allegedly missing evidence, coupled with the evidence that was actually offered by the defense, is weighed against the aggravating evidence, including the circumstances of the crime, there is simply no reasonable probability that the outcome of the proceeding would have been any different in this case.  4 SHCR-02 886-87 (finding no reasonable probability).  For these reasons, even if this Court finds deficient performance, Bigby is not entitled to relief on this claim.  *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir.  2005) (reiterating that both prongs of the *Strickland* test must be satisfied in order to be entitled to relief).

### D.    Conclusion

Bigby cannot show that the state court's decision to deny relief was an unreasonable application of the Supreme Court's precedent.  *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 699 (2002) (holding that the burden is on the petitioner to do more than just "convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly," but instead the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner").    Therefore, Bigby's ineffective-assistance-of-counsel claim should be denied.

## IV.   Counsel Did Not Perform Ineffectively During Voir Dire. (Claim 3)

Bigby claims that the defense team's allegedly inadequate investigation precluded them from conducting a meaningful voir dire. Petition at 77-83. In support, he supplies citations to the voir dire of the jurors ultimately selected. *Id.* at 77-79. But as noted by the state habeas court, Bigby does not suggest any specific additional questions his trial counsel should have asked venire members during voir dire or explain how the failure to ask additional questions rendered the performance of his trial counsel objectively unreasonable. *See generally* Petition at 80-83; 4 SHCR-02 889 (finding Bigby's allegations of deficiency and prejudice conclusory and concluding that counsel was not ineffective). Bigby's conclusory complaint simply does not satisfy the deficient performance prong of *Strickland.* Under *Strickland*, Bigby "must prove that his counsel made errors so serious that they deprived him of his Sixth Amendment rights and that the deficient performance prejudiced his defense." *Smith v. Puckett*, 907 F.2d 581, 584 (5th Cir. 1990). Generalized claims cannot satisfy this burden of proof; a habeas petitioner must show "specific incidents of actual prejudice resulting from counsel's performance" in order to meet the *Strickland* standard. *Id.* Thus, a "wholly general and conclusory assertion" will not establish a claim of ineffective assistance of counsel. *Id.*

In evaluating the performance of counsel, a court must indulge a strong presumption said counsel's conduct fell within the wide range of reasonable professional assistance; therefore, the defendant must overcome the presumption that, under the circumstances, the challenged action constituted sound trial strategy. *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Thus, the burden is on Bigby to allege specific facts which show his trial counsel's failure to ask the members of his jury venire, who eventually sat on his jury, specific questions during voir dire fell outside the wide range of presumptively reasonable professional performance. *See Amos v. Scott*, 61 F.3d 333, 346 (5th Cir. 1995) (holding the burden is on the petitioner to allege facts which, if proven, entitle him to relief).

Bigby has not alleged any specific facts identifying any specific areas of potential voir dire inquiry, much less any specific questions, which he contends his trial counsel should have asked any identified member of the jury venire. Nor does Bigby suggest any specific reasons why counsel's failure to ask those specific questions was objectively unreasonable. Bigby alleges no specific facts showing his counsel were aware, or should have been aware, during voir dire of any identified venire member who possessed an inability or unwillingness to give mitigating effect to any evidence counsel intended to rely upon as mitigating.

Under such circumstances, the state habeas court's conclusion this aspect of Bigby's ineffective-assistance-of-counsel claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented. This claim should be denied.

## V.     Bigby's Due Process Rights Under *Apprendi* Were Not Violated (Claim 4).

### A.     The Texas death-penalty statute did not deprive Bigby of his due process rights by failing to require that the State prove the mitigation special issue beyond a reasonable doubt.

Bigby asserts that his due process rights were violated because "the statute under which [Bigby] was sentenced death implicitly put the burden of proving the mitigation special issue on [Bigby] rather than requiring a jury finding against [Bigby] on that issue under the beyond a reasonable doubt standard." Petition at 84 (formatting omitted). The state court rejected this claim on both direct appeal and state habeas review. *Bigby v. State*, 2008 WL 4531979 at *6; 4 SHCR-02 889.

Under the capital sentencing scheme applicable to Bigby, once a defendant has been found guilty of capital murder, in order for a death sentence to be imposed, the jury is required to answer two special issues unanimously. *See*

Tex. Code Crim. Proc. Art. 37.071 § 2.  The first special issue—the "future dangerousness" special issue—asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at § 2(b)(1).  The State is required to prove this issue beyond a reasonable doubt.  *Id.* at § 2(c).  If the jury returns an affirmative finding to the future dangerousness special issue, then it proceeds to answer the second special issue—the "mitigation special issue"—which asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance of circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*Id.* at § 2(e)(1).[14]  The mitigation special issue assigns no burden of proof, either to the defendant or to the State.  *See Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) ("[N]either party bears the burden of proof at punishment on the mitigating evidence special issue.").  If the jury's answer to the mitigation

---

[14]     Under Article 37.071 Section 2(f), the trial court is required to charge the jury that in answering the mitigation special issue, the jury:

(1)     shall answer the issue "yes" or "no";

(2)     may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

(3)     need not agree on what particular evidence supports an affirmative finding on the issue; and

(4)     shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

special issue is "yes," the defendant receives a life sentence; if the answer is "no," the defendant receives a death sentence.

Bigby argues that his due process rights were violated because the State is not assigned the burden of proving the absence of mitigating factors beyond a reasonable doubt under the second special issue. Bigby specifically argues that he is entitled to relief under *Apprendi*, which requires that any aggravating circumstance that elevates a sentence beyond the statutory maximum must be determined by a jury beyond a reasonable doubt. Petition at 84-89. But because the jury's answer to the mitigation special issue is not a factor in aggravation of a death sentence, the absence of a burden of proof does not violate the Sixth Amendment.

*Apprendi* was decided on the narrow grounds that a jury must determine beyond a reasonable doubt whether *aggravating* factors exist that increase a defendant's punishment beyond the "prescribed statutory maximum" authorized by the jury's verdict. Under Texas Penal Code Sections 12.31 and 19.03, the "prescribed statutory maximum" for capital murder is fixed at death. Nothing in the mitigation special issue can enhance a capital-murder sentence beyond the prescribed range. Bigby argues nonetheless that the *Apprendi* decision applies to the mitigation special issue because the jury's answer can potentially

*reduce* a defendant's sentence from the statutory maximum. *Apprendi* , however, does not support this premise.

In *Apprendi*, the Supreme Court specifically noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n.16. Where a judge finds a fact in mitigation that allows a defendant to "escape the statutory maximum" attached to a jury verdict, that finding by a judge "neither expose[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone." *Id.* Similarly, in a concurring opinion joined by Justice Scalia, Justice Thomas pointed out that facts with the potential to mitigate punishment are not an element of a crime that might increase a sentencing decision. *Id.* at 501 (suggesting that "a 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)").

Unlike the circumstances presented *Apprendi*, the Texas mitigation special issue does not operate as "the functional equivalent of an element of a greater offense." *Apprendi,* 530 U.S. at 494. Bigby's argument improperly attempts to construe the mitigation special issue as an aggravating factor by suggesting that the *absence* of sufficient mitigating evidence *functionally*

aggravates his sentence from life to death. Although he is correct that a Texas capital-sentencing jury must specifically answer the disputed issue in the negative to render a death sentence, the *function* of that special issue is designed to inure to the defendant's benefit by allowing the jury a broad mechanism to give effect to the defendant's mitigating evidence. Bigby's reading of *Apprendi* would illogically result in requiring prosecutors to prove a negative beyond a reasonable doubt. It is impossible under the Texas system (which leaves it to the individual jurors to decide what evidence is mitigating and whether that evidence suggests mercy be imposed) to prove the *absence* of mitigating evidence beyond a reasonable doubt. *Apprendi* affects only traditional findings that *aggravate* a sentence and is inapposite to Bigby's claim.

Furthermore, as the Fifth Circuit held in *Rowell*, "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Thus, any extension of this precedent would create a new rule of constitutional law in violation of *Teague*. 489 U.S. at 310. AEDPA permits habeas relief only on the basis of "clearly established" federal law. 28 U.S.C. § 2254(d). "Clearly established federal law" refers to the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *(Terry) Williams*, 529 U.S. at 412; *Yarborough v. Alvarado*,

541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "). Consequently, Bigby may not obtain relief based on rules of constitutional law that have yet to be announced, or that were announced after his conviction became final. *Teague*, 489 U.S. at 310. Under *Teague*, a new rule is one where the result was not "dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 30; *see also Saffle v. Parks*, 494 U.S. 484, 488 (1990) (noting that the question is "whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution"); *O'Dell v. Netherland*, 521 U.S. 151 (1997) (noting that rule under *Teague* is whether "the rule . . . [is], in light of this Court's precedent, 'susceptible to debate among reasonable minds.'") (quoting *Butler v. McKellar*, 494 U.S. 407 (1990)). There are only two limited exceptions to *Teague*'s non-retroactivity principle. The first exception is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways. *Graham v. Collins*, 506 U.S. 461, 477 (1993). The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *Id.* Accordingly, even if these special issues actually did present the kind of

aggravating factors requiring the procedural safeguards set forth in *Apprendi*, the retroactive application of such requirements in federal habeas review of state convictions would be barred by the non-retroactivity doctrine of *Teague*.

Federal courts cannot grant habeas relief unless the state court's decision conflicts with clearly-established federal law as determined by the Supreme Court or "[is] based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). There is no such conflict here. Accordingly, this claim must be denied.

**B.** **The state court reasonably concluded that the prosecution is not constitutionally required to allege the punishment-phase special issues in the indictment.**

In conjunction with the previous claim, Bigby also argues that the narrowing factors of the punishment-phase special issues must be alleged in the indictment. Petition at 89-90. However, Bigby erroneously assumes that the Fifth Amendment right to an indictment had been incorporated into the Due Process Clause of the Fourteenth Amendment as applicable to the states. Furthermore, as above, Bigby's argument incorrectly construes the Supreme Court's holdings in *Apprendi*. Finally, even if Bigby's claim had merit, it would be barred by the non-retroactivity doctrine of *Teague*. Consequently, the state court properly rejected this claim. *Bigby v. State*, 2008 WL 4531979 at *8; 4 SHCR-02 889.

1.      **The Grand Jury Clause of the Constitution has not been incorporated against the states.**

The Fifth Amendment right to indictment has not been incorporated into the Due Process Clause of the Fourteenth Amendment as applicable to the states. Indeed, the specific requirements of the Fifth Amendment pertaining to federal indictments are among the few provisions of the Bill of Rights not incorporated into the Fourteenth Amendment requirements imposed on the states. *See Hurtado v. California*, 110 U.S. 516 (1884); *Albright v. Oliver*, 510 U.S. 266 (1994) (noting that the Fifth Amendment right to indictment was not among the Bill of Rights provisions incorporated into the Fourteenth Amendment). Thus, the Court is obligated by controlling Supreme Court precedent to deny relief on this claim.

2.      **Bigby's claim incorrectly construes the Supreme Court's holdings in *Apprendi*.**

Bigby asserts that not including the special issues in the indictment failed to give him proper notice and failed to force the State to plead all elements necessary to be proven for imposition of the death penalty. Petition at 89-90. Under Texas law, everything necessary to prove guilt must be alleged in an indictment. *See Callins v. State*, 780 S.W.2d 176, 187 (Tex. Crim. App. 1986). The special issues of Texas Code of Criminal Procedure article 37.071 are not elements of the offense of capital murder, however, and do not need to be proved

to sustain a capital conviction.  The special issues relate only to punishment.  *See Sharp v. State*, 707 S.W.2d 611, 624 (Tex. Crim. App. 1986) (holding that the indictment need not state more than is necessary to be proved to sustain a conviction); *see also Rosales v. State*, 748 S.W.2d 451, 458 (Tex. Crim. App. 1987); *Castillo v. State*, 739 S.W.2d 280, 299 (Tex. Crim. App. 1987).

This state law does not conflict with established federal law.  Specifically, federal law requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the indictment.  *See Apprendi*, 530 U.S. at 476.  Under Texas law, the death penalty is the statutory maximum sentence allowed for capital murder.  Section 19.03 of the Texas Penal Code sets forth the crimes and defines the elements necessary to qualify as a capital murder.  All defendants found guilty of capital murder are eligible for the death penalty when the State seeks such a sentence.  Tex. Code Crim. Proc. Art. 37.071 § 2(a)(1).  Thus, in Texas, the aggravating elements that render a person death-eligible are determined before the punishment-phase of trial.  *See Lowenfield*, 484 U.S. at 245-46 (noting that, in Texas, capital-murder aggravating factors are determined at the guilt-innocence phase of trial); *Jurek v. Texas*, 428 U.S. 262, 268-75 (1976) (reviewing and upholding the Texas death-penalty statutory scheme); *Zant v. Stephens*, 462 U.S. 862, 876 n. 13 (1983) (discussing *Jurek* and noting that, "in Texas, aggravating and mitigating

circumstances [are] not considered at the same stage of the criminal prosecution."). Accordingly, the punishment-phase special issues neither "expose[d] [Bigby] . . . to a greater punishment than that authorized by the jury's guilty verdict" nor operated as "the functional equivalent of an element of a greater offense." *Apprendi*, 530 U.S. at 494 & n. 19. Plainly, the punishment-phase special issues are not "elements" of capital murder under Texas law. Bigby was rendered death-eligible as soon as the jury convicted him of capital murder.

### 3. Relief on this claim is barred by *Teague*.

Moreover, nowhere in *Apprendi*—or any other Supreme Court case—is there any requirement that Texas prosecutors plead punishment-phase issues in capital murder indictments. And finally, Bigby had "notice" of the special issues by virtue of the Texas statute. *See* Tex. Code Crim. Proc. Art. 37.071 § 2. Consequently, any mandate that the special issues be pled in indictments would be tantamount to a new rule of constitutional law in violation of the non-retroactivity provisions in *Teague*, *supra*.

The state court's rejection of Bigby's claim was objectively reasonable and not contrary to clearly-established federal law. Consequently, Bigby is not entitled to federal habeas relief on this claim.

**VI.    The State Court Reasonably Held that the Evidence Presented at Punishment Was Legally Sufficient to Support the Jury's Finding That Bigby Would Constitute a Future Danger to Society.  (Claim 5)**

In his fifth claim, Bigby attacks the legal sufficiency of the evidence showing that he constitutes a future danger.  Petition at 91-93.  However, Bigby failed to raise this claim to the Texas Court of Criminal Appeals on direct appeal.  *See generally Bigby v. State*, 2008 WL 4531979.  Consequently, this claim is procedurally barred from federal habeas corpus review.  Furthermore, the state habeas court noted that even if Bigby were not barred, the evidence was still sufficient to show that he constituted a future danger to society.  4 SHCR-02 895.  Thus, it is clear that the state court's resolution of this claim was not unreasonable.  Consequently, this Court should deny relief.

### A.    This claim is procedurally barred.

It is well-settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.  *Coleman*, 501 U.S. at 729; *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Amos*, 61 F.3d at 338.  Where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas corpus relief absent a showing of cause for the default and actual prejudice that is attributable to the default, or that the federal court's failure to consider the claim will result in a miscarriage of justice.  *Coleman*, 501 U.S. at

750.  A miscarriage of justice in this context means that the petitioner is actually innocent of the crime of which he was convicted.  *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992); *Smith v. Dixon*, 14 F.3d 956, 974 (5th Cir. 1994).

It has long been the case in Texas that a sufficiency-of-the-evidence claim is not cognizable in a post-conviction writ of habeas corpus.  *Ex parte Easter*, 615 S.W.2d 719, 721 (Tex. Crim. App. 1981); *Ex parte Williams*, 703 S.W.2d 674, 677 (Tex. Crim. App. 1986); *Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1988) (en banc); *Ex parte Ash*, 514 S.W.2d 762, 763 (Tex. Crim. App. 1974).  The Fifth Circuit has also recognized this state procedural bar.  *See West v. Johnson*, 92 F.3d 1385, 1398, n.18 (5th Cir. 1996); *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994) (recognizing that under Texas law a claim regarding sufficiency of the evidence may be raised on direct appeal but not in a habeas corpus proceeding).

Bigby did not raise his sufficiency-of-the-evidence claim in his direct appeal, and his state application was denied on the findings of the trial courts.  *See generally Bigby v. State*, 2008 WL 4531979.  The state habeas court expressly applied a procedural bar to Bigby's claim, noting that sufficiency-of-evidence claims are not cognizable in state habeas proceedings.  4 SHCR-02 895.  Because the denial of Bigby's claim was based upon an adequate and independent state procedural rule, his claim is procedurally barred unless he can demonstrate cause and prejudice or a miscarriage of justice.  *Coleman*, 501 U.S.

at 750.  Bigby has failed even attempt to show cause and prejudice or that he is

actually innocent of the crime for which he was convicted.  Thus, his allegation

is procedurally barred from federal habeas corpus review.

> **B.      Alternatively, this claim is meritless.**

When a petitioner asserts that the evidence presented to the state court

was insufficient to find future dangerousness, the limited question before a

federal habeas court is "whether the [Court of Criminal Appeals'] decision

constitutes an 'unreasonable application' of [*Jackson v. Virginia*, 443 U.S. 307

(1979)]." *Martinez v. Johnson*, 255 F.3d 229, 241 n. 21 (5th Cir. 2001); *Callins v.

Collins*, 998 F.2d 269, 276 (5th Cir. 1993).  Under this standard, the court again

looks at the evidence in the light most favorable to the verdict to determine

whether any rational trier of fact could have concluded beyond a reasonable

doubt that petitioner would probably commit criminal acts of violence that would

constitute a continuing threat to society.  *Jackson*,  443 U.S. at 307; *Allridge v.

State*, 850 S.W.2d 471 (Tex. Crim. App. 1991) .

In the instant case, the state habeas court framed its analysis under that

constitutional standard.  4 SHCR-02 895.  After evaluating the evidence in the

light most favorable to the prosecution, the court concluded that a rational trier

of fact could find the essential elements of future dangerousness beyond a

reasonable doubt.  *Id.*  This finding is supported by the record, as explained in

detail in the Statement of Facts, *supra*, and the Director's analysis of the

prejudice prong of Bigby's ineffective-assistance-of-counsel claim, *supra.* With

due deference to "the responsibility of the trier of fact fairly to resolve conflicts

in the testimony, to weight the evidence, and to draw reasonable inferences from

basic facts to ultimate facts," the evidence presented at Bigby's trial was plainly

enough to support a finding of future dangerousness. *Jackson*, 443 U.S. at 319.

Accordingly, relief is barred under AEDPA.

## VII.   Bigby is Not Entitled to Federal Habeas Relief on His Claim that the Texas Capital-Sentencing Scheme Violates the Eighth-Amendment Prohibition Against Cruel and Unusual Punishment.  (Claim 6)

Bigby argues that the Texas death-penalty scheme is unconstitutional

because the mitigation special issue permits the sentencing jury open ended

discretion in violation of the Eighth and Fourteenth Amendments.  Petition at

94-96.  Bigby relies upon Justice Blackmun's dissent from the denial of certiorari

in *Callins v. Collins*, 510 U.S. 1141 (1994), to argue that the Texas capital

punishment scheme should be declared unconstitutional because, in its current

form, the death penalty is not fairly administered with reasonable consistency.

Specifically, he contends that the mitigation special issue allows the jury

unfettered discretion to determine whether a death sentence is appropriate in

a particular case.  According to Bigby, the arbitrary and capricious imposition

of the death penalty that results from such open-ended discretion violates the Eighth and Fourteenth Amendments.

Nevertheless, the Supreme Court has repeatedly held that the Texas capital sentencing scheme is constitutionally sound. *Johnson v. Texas*, 509 U.S. 350, 373 (1993); *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Jurek*, 428 U.S. 262. Specifically, the Court has stated that "we have previously recognized that the Texas Special Issues adequately 'allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion.'" *Franklin*, 487 U.S. at 182 (quoting *Lowenfield v. Phelps*, 484 U.S. 231 (1988)). The Texas scheme ensures that the sentencer will have adequate guidance when determining sentencing because it authorizes the defense to present to the jury, in a separate hearing, any relevant mitigating circumstance related to the defendant. *Johnson*, 509 U.S. at 363. The Texas special issues system therefore guides "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion." *Id.* at 364.

Under the Texas scheme, a capital defendant is considered death eligible once convicted of capital murder during the guilt-innocence phase. *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002); *Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002). The discretion that exists during the punishment phase

under the mitigation special issue was designed to give the jury "open-ended" discretion to *not* impose the death sentence. The jury in the present case was instructed under the revised Article 37.071 (2)(e)(1),which now requires the jury to decide whether, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." This instruction was crafted pursuant to legislative changes resulting from the Supreme Court's decision in *Penry I, see Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996), and was approved, at least implicitly, by the Supreme Court in *Penry II*, 532 U.S. at 803. It is odd that Bigby complains about discretion in the Texas system that is aimed and designed to work entirely to his benefit.

Furthermore, even if this Court were inclined to accept Bigby's argument, federal habeas relief on this claim is foreclosed under the principles of *Teague*, *supra*. For this reason, and those stated above, Bigby is not entitled to federal habeas relief on this claim.

## VIII. The State Court Reasonably Found That Bigby's Rights under the Eighth and Fourteenth Amendments Were Not Violated under the Supreme Court's *Penry II* Decision

Bigby contends that his due-process rights and his right to be free from

cruel and unusual punishment were violated under the Supreme Court's decision in *Penry II* because the mitigation special issue send mixed signals to the jury, thereby rendering any verdict reached in response to that special issue intolerably unreliable. Petition at 97-100. The state habeas court found that the Court of Criminal Appeals had previously rejected this claim and Bigby offered no argument to justify reconsideration of the issue. 4 SHCR-02 896 (*citing Scheanette v. State*, 144 S.W.3d 503, 506 (Tex. Crim. App. 2004).

A review of the instruction given clearly shows that Bigby's capital-sentencing jury was not denied a vehicle for expressing its reasoned moral response to Bigby's mitigating evidence. The trial court instructed the jury on the mitigation issue, Issue No. 3, as follows:

### SPECIAL ISSUE NUMBER 3:

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

7 CR-02 869 (jury charge on punishment).

The Fifth Circuit has repeatedly held that "Texas' definition 'encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 Fed. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)). Furthermore, the Supreme Court specifically commended the current

Texas capital-sentencing scheme, calling the new statute "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity." *Penry II*, 532 U.S. at 802-803.  Accordingly, Bigby he has not shown that the state court proceedings with respect to his ineffective-assistance-of-counsel claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  This claim should be denied.

## IX.   Bigby's Challenge to the Texas's Lethal-Injection Process is Without Merit.  (Claim 8)

Bigby's claim that the manner of execution in Texas violates his Eighth Amendment guarantees against cruel and unusual punishment is precluded by the Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008).[15]  The Court in *Baze* addressed Kentucky's three-drug protocol for lethal injection and held that it was constitutional, finding that the petitioner in *Baze* failed to demonstrate that Kentucky's lethal injection procedure creates a substantial risk of serious harm that would be reduced by the use of an alternative protocol. *Id.* at 51-52.  Like Kentucky's protocol, Texas's uses three chemical agents and

---

[15]    The state court found that this issue was not ripe for review because Bigby's execution was not imminent.

the process is similar to that utilized by other states.  Moreover, as was the case in *Baze*, Bigby alleges a number of issues with Texas's current protocol, but he fails to demonstrate that the drug protocol creates a substantial risk of serious harm and has not offered an alternative drug protocol that would reduce the risk, if any, of serious harm.

The Court not only upheld the constitutionality of Kentucky's protocol but clearly sets out that its holding applies equally to all "substantially similar" protocols used in other states:

> A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

*Id.* at 61.

Thus, the only issue before this Court is whether the Texas execution protocol is "substantially similar" to that of Kentucky.  Although this Court could readily determine from the TDCJ-CID written protocol—either prior to or after the May 30, 2008 revisions—that this is indeed the case, the Texas Court of Criminal Appeals has already done so.  *Ex parte Chi,* 256 S.W.3d 702, 703-04 and n.3 (Tex. Crim. App.  2008) ([Kentucky's lethal-injection protocol] . . ."is materially indistinguishable from Texas's lethal-injection protocol," citing in

footnote 3 to Chi's assertion of that fact); *see also id.* at 704-705 (concurring opinion by J. Cochran, joined by J. Womack) (TDCJ-CID has "graphically demonstrated the similarities between the Texas lethal-injection protocol and that of Kentucky's which was upheld by the United States Supreme Court in *Baze.*") and n. 5 (comparing two protocols and noting chief distinction is the lack of "practice sessions" but noting that Kentucky has used protocol only once while Texas has executed over 400 inmates).

Just as in *Baze,* Bigby alleges that due to potential flaws in the Texas protocol, he may not receive a proper dose of the anaesthetic sodium thiopental. Thus, he may be conscious when the pancuronium bromide and potassium chloride are injected, thereby rendering his death painful. But as the chart below shows, the protocols used by Texas and Kentucky are substantially similar:

|  | **Texas** | **Kentucky** |
|---|---|---|
| Sodium thiopental | 3 grams | 3 grams |
| Pancuronium bromide | 100 mg | 50 mg |
| Potassium chloride | 140 meq | 240 meq |
| Person(s) reconstituting sodium thiopental | Drug injectors | Warden |
| Time allowed to insert | No stated limitation | Up to one hour |
| Where inserted | Left and right arm | Preference order: arm, hands, ankles/feet, or neck |
| Medical doctor present | Yes | Yes |

| Drug team qualifications | "Medically trained individual" | Minimum 1 year professional experience as certified medical assistant, phlebotomist, EMT, paramedic or military corpsman |
|---|---|---|
| Practice sessions | Yes | Ten annual sessions including complete protocol walk-through and catheter siting into volunteers |
| Primary/backup IV lines | Yes | Yes |
| Observers, IV malfunction and tissue infiltration | Yes | Warden, assistant warden |
| Redirection of chemicals to backup IV site if prisoner does not lose consciousness within 60 seconds | Yes | Warden required to redirect |
| Saline injected in IV line between administration of chemicals | Yes | Yes |

Both Kentucky and Texas have safeguards—multiple IV lines, using medically trained personnel, consciousness checks, continuous observation of the IV line—to minimize any risks of problems in implementation of the injection protocol.   "These [] measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected."

-68-

*Baze*, 553 U.S. at 55.  The readily apparent similarities in the protocols foreclose Bigby's claim that the Texas protocol creates an unacceptable risk that he will experience excruciating pain and suffering.

Under the Texas protocol, a medically-trained individual connects two IV catheters, one primary and one backup.  Three individuals—the CI division director, or designee, the warden, or designee, and the medically trained individual—watch the IV to ensure that the rate of flow is uninterrupted.  *Id.* During the application of the sodium pentothal, the CI Division director, or designee, and the warden, or designee, observe the appearance of the condemned individual.  If the condemned individual shows no signs of being awake, the CI division director or designee shall instruct the drug team to proceed to the next step.  If the condemned individual does show signs of being awake, the CI division director or designee shall instruct the drug team to switch to the backup IV to administer another lethal dose of sodium pentothal.

Moreover, Bigby's evidence and assertions of practice variance and "botched" executions amounts to nothing more than difficulty in inserting the IV catheter on a handful of inmates, most who were IV drug addicts, and all before 1998.  This evidence is over ten-years old and more than 250 inmates have been executed since.  This fails to rise to the level of a "demonstrated risk of severe pain," as required by this Court and Bigby still fails to offer any alternatives, as

required by *Baze*.  Thus, Bigby fails to establish that Texas lethal-injection protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment, and this Court should deny relief.

Accordingly, under the Supreme Court's decision in *Baze*, Bigby's claim of cruel and unusual punishment is without merit and should therefore be denied. Any argument for reconsideration must be directed to the Supreme Court itself.

## CONCLUSION

For the foregoing reasons, Bigby's petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

* Attorney-in-charge

   /s/ Stephen M. Hoffman
*STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
P. O. Box 12548, Capitol Station
Austin, Texas   78711
Tel: (512) 936-1400
Fax: (512) 320-8132
Stephen.Hoffman@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that on September 10, 2010, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means :

John W. Stickels
6211 Airport Freeway
Fort Worth, Texas 76117
Email: jstickels@uta.edu

   /s/ Stephen M. Hoffman
STEPHEN HOFFMAN
Assistant Attorney General