IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JAMES EUGENE BIGBY,            §
      *Petitioner,*          §
                             §
V.                            §
                             §    No. 4:08-CV-765-Y
RICK THALER, Director,         §
Texas Department of Criminal   §    (death-penalty case)
Justice, Correctional          §
Institutions Division,         §
      *Respondent.*          §

## MEMORANDUM OPINION AND ORDER
## DENYING APPLICATION FOR WRIT OF HABEAS CORPUS

Petitioner James Eugene Bigby, sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his death sentence is unconstitutional in several respects.  Respondent Rick Thaler has filed a brief in response.  The Court denies relief.

## I.  History of the Case

In late 1987, Bigby killed three friends (plus the infant son of one of them) because he believed they were conspiring with Frito-Lay to avoid paying him a workers' compensation claim.  In 1991, Bigby was convicted of capital murder and sentenced to death.  *State v. Bigby*, No. 0329813D (Tarrant Co. Crim. Dist. Ct. No. 3, Mar. 25, 1991) (Leonard, J.); (4 CR 396).[1]  The conviction and sentence were affirmed on appeal and state habeas relief was denied.  *Bigby v. State*, 892

---

[1] The trial court clerk's record consists of 8 volumes and is cited "CR," preceded by the volume number and followed by the page number.  The 40-volume reporter's record is cited "RR," and the 4-volume state habeas record is cited "SHR."  Trial exhibits are cited as SX and DX for the state and defense, respectively.

S.W.2d 864 (Tex. Crim. App. 1994), *cert. denied*, 515 U.S. 1162 (1995); *Ex parte Bigby*, No. 34,970-01 (Tex. Crim. App. Feb. 4, 1998) (orig. proceeding). The United States Court of Appeals for the Fifth Circuit later vacated Bigby's death sentence due to jury-charge error under *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). *See Bigby v. Dretke*, 402 F.3d 551, 572 (5th Cir.), *cert. denied*, 546 U.S. 900 (2005).

In 2006, a new sentencing trial was held, and Bigby was again sentenced to death. *State v. Bigby*, No. 0329813D (Tarrant Co. Crim. Dist. Ct. No. 3, Sept. 21, 2006) (Berry, J.); (7 CR 881). The sentence was affirmed on direct appeal and state habeas relief was denied. *Bigby v. State*, No. AP-75,589, 2008 WL 4531979 (Tex. Crim. App. Oct. 8, 2008), *cert. denied*, 129 S. Ct. 1984 (2009); *Ex parte Bigby*, No. WR-34,970-02, 2008 WL 5245356 (Tex. Crim. App. Dec. 17, 2008) (orig. proceeding).

Bigby filed his federal petition for habeas relief on April 14, 2010 (doc. 8, 9) and presents the following claims:

1.  Counsel rendered ineffective assistance by failing to adequately investigate mitigation evidence.

2.  Counsel rendered ineffective assistance by failing to adequately present mitigation evidence.

3.  Counsel rendered ineffective assistance in failing to conduct meaningful voir dire examination on the mitigation issue (subclaims A through L).

4.  The Texas death-penalty procedure violates due process by placing the burden of proving the mitigation special issue on the defendant and because the indictment did not give notice of the facts the State intended to prove in order to establish eligibility for the death penalty.

5.    The evidence is insufficient to support the jury's answer to the future-dangerousness special issue.

6.    The Texas mitigation issue violates the Eighth Amendment because it allows the jury too much sentencing discretion and lacks minimal standards and guidance necessary to prevent the arbitrary and capricious imposition of the death penalty.

7.    The Texas mitigation issue violates the Eighth Amendment because it sends mixed signals to the jury, thereby rendering any verdict unreliable.

8.    The lethal injection protocol produces unnecessary pain, torture, and lingering death in violation of the Eighth Amendment.

Respondent filed an answer on September 10, 2010 (doc. 13) and furnished the state-court records.

## II.  **AEDPA Standard of Review**

Bigby initially asserts that the standard of federal habeas review required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") violates the separation-of-powers doctrine.  He argues that 28 U.S.C. § 2254(d), which prohibits habeas relief except for certain violations of Supreme Court precedent, constitutes a suspension of *stare decisis* as to circuit precedent and prohibits federal courts from saying what the law is.  Bigby asks the Court to conduct a *de novo* review for constitutional error in this case.  (*Petition* at 11-15.)

Bigby's position is squarely against circuit precedent.  *See Rivas v. Thaler*, 432 Fed. App'x 395, 407 (5th Cir.), *cert. denied*, 132 S. Ct. 850 (2011) (citing *Dufrene v. Brazoria Cnty. Dist. Attorney*, 146 Fed. App'x 715, 717 (5th Cir. 2005); *Hughes v. Johnson*, 191 F.3d

3

607, 612 (5th Cir. 1999); and *Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998)). Accordingly, the heightened standards of review set out in the AEDPA govern this petition.

For claims adjudicated on the merits in state court, a federal writ of habeas corpus will not be granted unless the state court arrived at a conclusion that was contrary to federal law then clearly established in the holdings of the United States Supreme Court, involved an unreasonable application of such law, or was based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Section 2254(d) does not authorize habeas relief, but bars relitigation in this Court of any claim adjudicated on the merits in state court, unless an exception in (d)(1) or (d)(2) applies. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (citing *Schriro v. Landrigan*, 550 U.S. 465 (2007)).

The phrase "adjudicated on the merits" is a term of art referring to a state court's disposition of a claim on substantive rather than procedural grounds. *See Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997). Evidence introduced in federal court has no bearing on the determination made pursuant to § 2254(d). *See Pinholster*, 131 S. Ct. at 1400; § 2254(d)(2). The standard in section 2254(d) is difficult to meet, highly deferential, and demands that state-court rulings be given the benefit of the doubt. *See Pinholster*, 131 S. Ct. at 1398 (quoting *Richter*, 131 S. Ct. at 786, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). "[E]ven a strong case for relief

4

does not mean the state court's contrary conclusion was unreasonable."
*Richter*, 131 S. Ct. at 786.

### III.  Trial Counsel's Representation (claims 1 and 2)

Bigby's first two claims for relief challenge trial counsel's investigation and presentation of mitigation evidence. Bigby presented these two habeas claims as one in state court. (1 SHR 29-63). The state habeas court concluded that counsel's representation was neither deficient nor prejudicial. (4 SHR 908-27).

### A.  Applicable Law

A challenge to trial counsel's representation must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that prejudice sufficient to undermine confidence in the trial outcome resulted from the deficiency. *See Bower v. Quarterman*, 497 F.3d 459, 466 (5th Cir. 2007)(citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). These standards are well known and will not be repeated. *See Bobby v. Van Hook*, 130 S. Ct. 13, 16-17 (2009) (per curiam); *Pinholster*, 131 S. Ct. at 1403; *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1100 (2012); *Druery v. Thaler*, 647 F.3d 535, 539 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1550 (2012). For purposes of the following discussion, Bigby must demonstrate that it was necessarily unreasonable for the Texas Court of Criminal Appeals to conclude (1) that he did not overcome the strong presumption of

counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 131 S. Ct. at 1403.

## B.  Allegations Against Trial Counsel

Bigby's petition reasserts the same arguments that the state court rejected.  He initially complains that counsel dismissed a mitigation specialist, Shelli Schade, and that Schade's replacement, Dr. Kelly Goodness, failed to conduct a mitigation and social-history investigation in accordance with accepted practices and ABA Guidelines.  He maintains that Dr. Goodness merely reviewed records from the first trial and that her dual role of mitigation specialist and mental-health consultant violated ABA guidelines.  (*Petition* at 41-44, 69-73.)

Bigby asserts that the substandard investigation failed to uncover psychiatric and/or institutional records of his brother, half-sister, and mother and overlooked critical information about his upbringing.  For example, his younger brother Jerry was raised by their father after the parents separated, and Jerry is a paranoid schizophrenic currently living in their father's former home, alone and unemployed.  Bigby asserts that his older half-brother, Ronald, could have provided information that their mother was an "alcoholic whore" who drank while pregnant with Bigby and breastfed Bigby until he was seven years old.  Ronald could have also shown that their mother gave away Ronald and two half-siblings, Arthur and Trudy, to be raised by relatives.  Counsel could have presented evidence that all of Bigby's siblings enjoyed little success in life due to their

6

mother's alcohol use, her mental-health issues, and her abandonment of them.  Although Bigby was not physically abandoned by his mother, Bigby asserts that he was abandoned by his father and always feared abandonment by his mother, who kept Bigby as her "helper" after her leg was amputated.  For this reason, Bigby tolerated his mother's dependence and lack of responsibility.  (*Petition* at 45-51.)

Bigby submits that the jury did not get an accurate picture of his life or consider the multiple risk factors in his upbringing that caused him to commit capital murder.  (*Petition* at 46, 51-53.) He contends that the lack of an accurate social history caused treatment providers to overlook his substance-abuse problem and resulted in varying, inaccurate mental-health diagnoses.  (*Petition* at 53-59.) He maintains that, without his family's medical records, counsel were unable to show Bigby's predisposition to mental illness.  (*Petition* at 59-61.)

Bigby criticizes counsel's overall presentation, which used the same "dueling expert" mitigation strategy that was used unsuccessfully in the first trial.  Bigby complains that his attorneys' plan to have him testify was aborted due to their inadequate preparation and poor rapport.  He additionally maintains that counsel's ineffective presentation lacked a new theme, contained minimal visual aids for the jury, and lacked social-history testimony.  (*Petition* at 61.)  He elaborates that counsel should have argued that he had a serious, untreated substance-abuse problem and should have used a genogram to explain the timing of the murders around Christmas.  Bigby posits that

7

counsel:  should have developed the theme that many choices were made for Bigby before he was capable of making choices for himself, should have attempted to humanize Bigby with evidence of his childhood and lack of accomplishments, and should have theorized that Bigby's final plan for a sense of accomplishment revolved around the idea of "going out in a blaze of glory."  *Petition* at 62-76, Ex. 2.

### C.  Background Facts

#### 1.  2006 Sentencing Trial

The following is an overview of the evidence adduced at the 2006 sentencing trial. Additional facts will be incorporated as needed into the discussion that follows.

On the evening of December 23, 1987, Bigby went to the home of his friend, Michael Trekell, and brought two steaks for dinner.  While Trekell was preparing the steaks, Bigby shot and killed him, and then drowned Trekell's sixteen-week-old son, Jayson Kehler.  (23 RR 21-104 (testimony of Trekell's common-law wife and a crime-scene investigator); 26 RR 26-103 (Detective LeNoir's testimony); 32 RR 69-70 (Bigby's statement to psychiatrist); SX 14, 15 (Bigby's police statements)).  Bigby then drove across town to the apartment of another friend, Wesley Crane.  After visiting with Crane for a while, Bigby asked Crane to drive him to the store in Crane's truck.  During the drive home, Bigby forced Crane to pull over and get out of the truck at gunpoint.  He shot Crane in the head, killing him, and left his body in the road.  Bigby returned to Crane's apartment complex,

retrieved a bag from his car containing a pistol and a shotgun, and drove away in Crane's truck. (23 RR 105-150 (testimony of Crane's girlfriend, Crane's son, apartment security guard, and witness who found body); 24 RR 118-216 (Detective Brennan); 32 RR 69-71; SX 14, 15). About 3:20 a.m. on December 24th, Bigby arrived at the home of his friend, Frank "Bubba" Johnson, and rang the doorbell. Johnson answered the door and, after a short discussion, Bigby shot him three times with the shotgun, killing him. He then fled in the truck. (23 RR 151-176 (Johnson's wife) 24 RR 9-42 (crime-scene investigator), 32 RR 69-71; SX 14, 15).

A massive manhunt ensued, and Bigby surrendered to police on December 26, 1987, after a stand-off at a local motel. During the stand-off, a police negotiator told Bigby, "You're an American. You're presumed innocent until proven guilty. Everything is going to be all right." Bigby replied, "I'm guilty. I know it and so do you." Bigby later confessed to the murders in writing. (24 RR 43- 64 (transporting police officer); 24 RR 65-94 (SWAT team negotiator); 26 RR 26-103 (Detective LeNoir); SX 14, 15). A fingerprint found on a wine cooler bottle at the Trekell home matched Bigby's left middle finger. A firearms expert testified that a bullet fragment recovered from the Trekell crime scene had been fired from a .357 revolver found in Bigby's motel room. (23 RR 66-104 (crime-scene investigator at Trekell home); 24 RR 217-44 (crime-scene investigator at hotel); 25 RR 5-25 (firearms expert).

The State next presented evidence that Bigby had been incarce-
rated for burglary in 1977 and for burglary of a motor vehicle in
1983.  The judge and several other persons connected to Bigby's 1991
trial testified about Bigby's attempt to kidnap the trial judge during
that first trial.  According to the testimony, Bigby had seized a
loaded revolver from the judge's bench, walked into chambers, pointed
the gun at the judge's head, and said, "Let's go, Judge."  The judge
immediately grabbed Bigby's hand and, with the prosecutor's assis-
tance, wrestled Bigby to the ground.  Two bailiffs entered the
chambers and removed the revolver from Bigby's hand.  (23 RR 94-96;
26 RR 56-109).  After this testimony, the State rested its case-in-
chief.

Defense counsel first presented photographic evidence of a
Christmas present Bigby had purchased for Jayson Kehler.  (23 RR 51;
27 RR 12-16 (testimony of crime-scene investigator); DX 24, 25).
Counsel then read the 1991 testimony of Bigby's father, William Bigby,
who had passed away since the first trial.  (27 RR 16-58 (1991
testimony of William Bigby).  Charles Noteboom and Lonnie Max Obeidin,
Bigby's lawyers on the workers' compensation matter, both testified
in person regarding their representation of Bigby and his paranoid,
strange, and threatening behavior. (27 RR 58-82, 82-101; *see also* SX
107 (investigator notes), SX 108 (Bigby's deposition testimony)).

The defense presented extensive evidence of Bigby's mental-health
treatment prior to the murders.  This included testimony from a
hospital employee who knew Bigby as a patient in 1987.  (27 RR 101-

10

13).  Bigby's treating psychiatrist, Harold Eudaly, also testified.
The evidence showed that Bigby had a treating psychologist, Dr. John
Koechel, and that Bigby was medicated and hospitalized three times in
1986 and 1987 for schizo-affective disorder and depression.  Bigby
received electroshock therapy during his third hospital stay, which
ended when he walked out of the hospital against Dr. Eudaly's advice
on December 11, 1987, twelve days before the murders.  (27 RR 115-171;
DX 49, 50, 51).  Counsel presented the 1991 testimony of the jail's
medical director to show that Bigby was prescribed antipsychotics and
antidepressants even after his arrest.  (27 RR 172-210).  The prior
testimony of defense experts, Clay Griffith and James Grigson, both
deceased, was also read to the jury.  These experts had examined Bigby
in 1989 and 1990.  Dr. Griffith diagnosed him with schizo-affective
disorder and paranoid delusional disorder.  Dr. Grigson diagnosed him
with chronic paranoid schizophrenia.  (27 RR 211-246; 28 RR 5-79).

Defense counsel presented evidence that Bigby had experienced a
religious conversion since the first trial.  Live testimony was
presented through a Christian minister in Oklahoma who had received
"tithes" from Bigby, a prison minister who counseled Bigby on death
row, and a county corrections officer who described Bigby's behavior
while awaiting trial in 2006.  (28 RR 80-90, 90-113, 118-27).

Larry Moore, Bigby's original trial counsel, also testified in
person.  He described Bigby's mental status, hallucinations, and
difficult behavior during the first trial.  Moore testified on cross-
examination that he had caused Bigby to be examined for competency by

psychologist Barry Norman after Bigby's attempt to kidnap the trial judge.  Moore also told the jury how Bigby later sought Moore's forgiveness for his behavior. (28 RR 128-153; 29 RR 11-37; SX 110 (Dr. Norman's report)).

A retired prison warden testified about Bigby's favorable prison record, which contained six or seven minor disciplinary infractions. She also opined on Bigby's prison classification in the event he received a life sentence. (29 RR 55-166; DX 58, 59 (prison records)).

Finally, counsel presented psychiatrist Lisa Clayton as a "teaching expert." She did not evaluate Bigby, but summarized the 1991 testimony of Drs. Coons,[2] Grigson, Griffith, and Eudaly, as well as Bigby's medical records and prison records.  She explained Bigby's varying diagnoses and where they fit into the spectrum of psychotic disorders.  She testified that Bigby's behavior during both trials was consistent with his psychosis. (29 RR 186-274).

On rebuttal, the State presented evidence of Bigby's extraneous, unadjudicated offenses, including car theft, burglary, sale and use of methamphetamine, identity theft, credit card fraud, check fraud, other scams involving stolen rental property, and a sexual assault of a five year-old girl when he was a teenager.  As an adult, Bigby regularly recruited younger men to help him steal cars and engage in other scams, several of whom testified for the State.  One witness described Bigby as a full-time thief.  A man who had known Bigby all

---

[2] Dr. Richard Coons was the State's expert in 1991 and, as discussed below, testified for the State on rebuttal in 2006. (29 RR 209).

of his life testified that Bigby's workers' compensation claim was also fraudulent.  (30 RR 29-97, 132-175; 31 RR 6-35, 75-105).

There was testimony that people were concerned about getting on Bigby's bad side.  Bigby once asked a friend to buy him a gun so he could kill his unfaithful girlfriend and a bunch of other people.  In 1986, Bigby had threatened to kill Frank "Bubba" Johnson and take half the Fort Worth Police Department with him.  Bigby's attitude was that he would never to be taken alive and would never go back to prison.  (30 RR 54-56, 77-79, 137, 150, 158; 31 RR 6-24, 35).

Meredith Perry knew Bigby in the 1980s, and she testified, among other things, that Bigby once removed the wing nuts on his mother's crutches, causing them to collapse.  Perry said Bigby also cashed his mother's disability check and stole Perry's prescription pain medicine to resell on the street.[3]  (31 RR 36-55).  Bigby's ex-wife testified that Bigby could pick locks and would enter her apartment when she was not home.  She moved to a women's shelter after Bigby had attacked her multiple times.  During their separation, Bigby broke into her apartment and drilled holes in her bathroom ceiling so he could spy on her from the attic.  (31 RR 113-23).  Another female acquaintance testified that Bigby would break into her apartment as well, and when she confronted Bigby, he grabbed her by the throat, shoved her, and told her he comes and goes as he pleases.  (31 RR 103-13).

---

[3]Bigby changed clothes after Perry's testimony and insisted on leaving the courtroom because she lied.  (31 RR 56-75).  After a lengthy discussion, the judge allowed Bigby to watch the trial on a video monitor and instructed the jury that Bigby had voluntarily chosen not to be present.  (31 RR 71, 75).

13

The State presented live testimony from its expert at the first trial, Richard Coons. Dr. Coons evaluated Bigby for competency and sanity in 1989 and relied on the records of this evaluation for his testimony. He diagnosed Bigby in 1989 with either methamphetamine-induced psychotic delusions or delusional disorder, persecutory type. His diagnosis in 2006 changed minimally. He believed Bigby had paranoid features to his personality that were exacerbated by heavy methamphetamine use. He also believed Bigby also had antisocial personality traits. According to Dr. Coons, Bigby developed the depression that resulted in his hospitalization because he "crashed" after he stopped using amphetamines. (32 RR 41-127).

The State's second expert and final witness was forensic psychologist Jack Randall Price. Although Dr. Price was not able to examine Bigby, he testified that the records "suggest and support" that Bigby has a long-standing personality disorder. He also saw a history of amphetamine abuse and depression. Dr. Price testified that in his opinion, Bigby's paranoid personality was exacerbated by the use of methamphetamines. (32 RR 167-225).

The defense's rebuttal case consisted of reading additional prior testimony of Bigby's father. The testimony indicated that Bigby could not have removed wing nuts from his mother's crutches because the crutches, which were introduced into evidence at the first trial, did not have wing nuts. (33 RR 52-53).

2. Jury Argument

14

In its jury argument, the State pointed out that Bigby planned the murder spree, set up his victims, and killed them by stealth. The State posited that Bigby has been well-behaved in prison only because of the contained environment and, if given the opportunity, he would be dangerous. The State described Bigby as a scammer whose mental symptoms are a result of methamphetamine abuse, not mental illness. The State stressed that Bigby expressed no remorse for killing anyone except the baby and had stated that there were six or seven other people he would have liked to have killed. The State argued that not all mentally ill people commit crimes and, irrespective of any mental illness, there is ample evidence showing that Bigby would be a future danger. (33 RR 57-68, 101-16).

Defense counsel argued that the murders did not make sense unless mental illness was factored in, especially as to the infant, whom Bigby liked. If Bigby had planned the murders, counsel argued, he would not have fled to a motel that was a stone's throw away from where Crane's body was found, and he would not have immediately admitted guilt when confronted by the police negotiator. Counsel pointed out that the State's predictions on future dangerousness in the first trial were proven wrong, because Bigby has shown that he can act properly when incarcerated in the general population and on death row. Counsel argued that Bigby was not the same person who murdered four people in 1987, that he is still mentally ill regardless of the label you give it, but he has undergone a genuine religious conversion that has dramatically changed his behavior. (33 RR 69-101).

### 3.  State Habeas Evidence

15

In support of his state habeas petition, Bigby presented a report prepared by Toni Knox, his habeas mitigation specialist.  The report included an assessment of the trial mitigation investigation and presentation and a 43-page psychosocial history.  (2 SHR 153-220). Supporting documents included a genogram (family tree), a timeline of Bigby's life, school records, and an affidavit of the dismissed mitigation investigator, Shelli Schade, with supporting documents. (2 SHR 221-71; 4 SHR 688).  Knox included a 1990 competency assessment from the first trial by Dr. Raymond Finn, a 1987 assessment from CPC Oak Bend Hospital, a 1920 national census, pages from Bigby's and his mother's high school yearbooks, and his mother's medical records.  (2 SHR 278-82, 287-90; 3 SHR 296-680; 4 SHR 690).  Knox submitted memoranda of interviews with several of Bigby's relatives, including Susan Black (a cousin), Judy Pogue (former sister-in-law), and Marvin Bigby (uncle).  (2 SHR 284, 292; 4 SHR 682).  In addition, there are two affidavits:  one from Bigby's older half-brother Ronald Blevins and another from former sister-in-law Jerita O'Neal.  (2 SHR 272; 4 SHR 684).

The State presented two affidavits from both trial counsel which are essentially identical.  The State also submitted an affidavit from the defense team's expert, Dr. Kelly Goodness, and her handwritten interview notes.  (4 SHR 799-844, 850-61).

### D.  Counsel's Investigation and Presentation

The judge who presided over the state habeas proceedings was the same judge who had presided over Bigby's 2006 trial.  (1 SHR 112; 4

SHR 939).   Where appropriate, she used her personal recollection of the trial to resolve the habeas issues.  (4 SHR 907).   She found that both of Bigby's appointed counsel were highly qualified, experienced capital-defense attorneys, who were very familiar with mitigation and mental-health issues in capital cases.  (4 SHR 909).

As an initial matter, the record does not support Bigby's assertion that his attorneys engaged in the same battle of experts that failed in his first trial.  Using both new evidence and evidence from the prior trial, counsel developed a two-part strategy for obtaining a life sentence based on the future-dangerousness and mitigation issues that were submitted to the jury in the court's charge.[4]

---

[4] These two issues are as follows:

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

See Tex. Code Crim. Proc. Ann. art. 37.0711, §§ 3(b)(2) and 3(e)(West 2012); (7 CR 871).  A "yes" answer to the future dangerousness issue and a "no" answer to the mitigation issue required the court to assess a sentence of death.  See art. 37.0711, § 3(g).

In this case, a third issue asked: "Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant that caused the death of Michael Trekell was committed deliberately and with a reasonable expectation that the death of Michael Trekell or another would result?"  See art. 37.0711, § 3(b)(1).  This deliberateness issue, which requires a "no" answer for a death sentence, is no longer used for crimes committed after 1991.  Compare art. 37.071, § 2(b).  Because Bigby's

Counsel first sought to prove that Bigby would not pose a future danger if given a life sentence because he had spent 15 years on death row with no significant disciplinary problems.  Counsel showed that Bigby's first death-row facility was less secure and allowed Bigby to work in a garment factory with access to sewing machines and scissors, such that Bigby's lack of violent behavior could not be dismissed entirely as a product of the security conditions.  (29 RR 99-102; 32 RR 109-10, 114-115, 124-25; 33 RR 38-41; 33 RR 71-72 (argument)).  This strategy included new testimony about Bigby's religious transformation while incarcerated and its ameliorating effect on his anger and his mental illness.  (28 RR 82-87, 98, 123-24, 140; 32 RR 117-18, 220-22; 2 SHR 262, 266 (emails explaining counsel's strategy); 33 RR 74-75, 87 (argument)).  Obviously, none of this information was available at the first trial.  Counsel considered this future dangerousness issue, which the prosecution had to prove beyond a reasonable doubt, as more likely to save Bigby's life than the mitigation issue and, according to counsel, the lead prosecutor agreed.  (4 SHR 722, 738).

The mitigation portion of counsel's strategy focused on Bigby's mental illness at the time of the offense, using the 1991 experts. Trial counsel rejected a strategy based on Bigby's current (i.e., 2006) mental illness because (1) a new examination of Bigby would have

---

offense occurred in 1987, the deliberateness issue was retained for his resentencing in 2006.  *See* art. 37.0711, § 1. It does not affect the analysis of the issues in this case.

produced evidence of psychopathy (which is a personality disorder not a mental disorder (32 RR 173)), and (2) Bigby would have refused to cooperate or had outbursts before the jury, thereby undermining counsel's efforts to show he was not a future danger. (4 SHR 721-22, 736-37).

Counsel outlined three advantages to relying on the 1991 experts. First, the deceased experts could not be further cross-examined and their cross-examination at the first trial was largely related to insanity, which was not an issue on retrial. Second, their examinations were closer in time to the offense than any new examination would be. Third, it prevented Bigby from being subjected to a new state-sponsored mental-health examination. (4 SHR 720-21, 735; 6 CR 808; 7 CR 823).

Counsel's reasoning is supported by the record. The record demonstrates Bigby's belief that God cured his mental illness and drug addiction and that Bigby disagreed with a strategy of present mental illness. (2 SHR 266; 4 SHR 832-44; 2 RR 15, 23 (motion for self-representation); 31 RR 66-67 (Bigby tells trial judge, "I believe everybody in the courtroom knows I'm competent.  I'm competent")). Although counsel and Dr. Goodness believed Bigby was competent and possessed improved mental health in 2006 (2 SHR 266, 269; 4 SHR 719, 733), Bigby was still prone to outbursts and demonstrations in the courtroom. (2 RR 4-37; 4 RR 24, 52; 25 RR 92, 103-04, 31 RR 56-75). Counsel was rightly concerned about undermining his case against future dangerousness by triggering another courtroom outburst from Bigby, which counsel believed would scare the jury, given the

19

similarity it would have had to Bigby's behavior during the first
trial. (4 SHR 722, 737). Counsel's concern about exposing Bigby to
a formal diagnosis by a state's expert is likewise supported by the
testimony of the two state experts who, unable to examine Bigby in
2006, linked his offense to antisocial or psychopathic "traits" and
"behavior." (32 RR 77, 204).

This two-part strategy and counsel's supporting investigation
were objectively reasonable.  According to their affidavits, counsel
had the records from the first trial and from first trial counsel,
Larry Moore, which documented interviews with Bigby's family members.
(4 SHR 719-20, 733-34, 857, 860).  Counsel also met with Moore to
discuss his earlier efforts.  Counsel reviewed discovery from the
prosecution, interviews of lay and expert witnesses, consultations
with mental-health professionals, and prison records.  (4 RR 8, 14,
32-35 (discovery hearing); 5 CR 564-66, 571-72, 594-96; 7 CR 832
(discovery compliance); 6 CR 636 (discovery motion), 660).  When
counsel asked Bigby about family members who might provide informa-
tion, Bigby stated that almost every one of his relatives were
deceased and that his favorite brother had died from brain cancer.[5]
(4 SHR 857, 860; *see* 2 RR 26).  Counsel contacted prison employees and
spoke with LeAnn O'Neal (Bigby's niece), Meredith Perry, and "J.
Mears," but they were of no assistance.  (2 SHR 261; 4 SHR 722, 738,
858, 861).

---

[5]Presumably, this is a reference to Arthur O'Neal, who died of
cancer in 2005.  (4 SHR 684 (affidavit of Arthur's wife)).

Counsel retained forensic psychologist Kelly Goodness to evaluate Bigby's competency, review portions of the record from the first trial, and make recommendations about using Bigby's mental health issues in mitigation. (4 SHR 702-03). When the mitigation investigator was dismissed, Dr. Goodness provided additional services to support counsel's decision to focus on Bigby's mental state at the time of the offense and to tie together relevant material obtained throughout the years. (4 SHR 703). Dr. Goodness analyzed voluminous records and mental-health opinions, provided a current diagnosis of Bigby and a diagnosis at the time of his first trial, interviewed relevant people, and identified fact witnesses. (4 SHR 703-04). She cultivated psychiatrist Lisa Clayton as their teaching expert due to Dr. Clayton's unique relationship with the original experts. (4 SHR 704, 721, 735; 29 RR 186-274). Dr. Goodness developed a rapport with Bigby and spoke to him at great length. (4 SHR 719, 732, 831-844; 6 CR 725 (Bigby recounts visit with Dr. Goodness)).

Counsel's affidavits show that they knew of multiple social history reports already in the record, four of which are acknowledged in Knox's report. (4 SHR 857, 860; 2 SHR 164-66). The social history dated July 7, 1987, was prepared by a certified social worker and specifically mentions Bigby's prior use of speed, marijuana, and alcohol, and the general circumstances of his family of origin. (27 RR 138; 37 RR 52-55). Counsel chose to use experts who had already evaluated Bigby and were now deceased, making a new social history unnecessary for a mental-health diagnosis. And while Bigby criticizes the existing reports for lacking detail or minimizing his drug abuse

21

and family dysfunction, there is no basis to conclude that Knox's social history would have changed Bigby's diagnosis. In fact, Bigby does not identify any diagnosis that, if assigned to him, would have been more mitigating than the range of psychoses that Dr. Clayton assigned to him at trial; he simply states his diagnosis "may have been different." (2 SHR 166); *Petition* at 58.

Furthermore, Knox states in her report that an actual diagnosis is not as important in trial as an inventory of symptoms. (2 SHR 167). Through the testimony or prior testimony of Bigby's father, three former attorneys, a hospital employee, the former medical director of the county jail, two former defense experts, and a prison chaplain, the jury received evidence of Bigby's obsession with his workers' compensation lawsuit, his paranoia, delusions, depression, disordered thinking, and medications. (27 RR 21-23, 29-30, 41-48, 51-55, 66-68, 70-72, 87-88, 106, 109, 176-89, 220-30; 28 RR 13-17, 23-33, 70, 99, 109-12, 134-39). Counsel introduced evidence regarding the separation of Bigby's parents, Bigby's separation from Jerry, his mother's physical disability and Bigby's "helper" status. (27 RR 19, 26, 37-38, 46-49). The jury heard evidence that Bigby's mother and aunt were in nursing homes due to mental incompetence and that dementia is more common in people with schizophrenia. (27 RR 19, 24-25, 31, 37, 46-47; 29 RR 220; 4 SHR 858, 860-61). The jury was left to infer from this information that Bigby's mother and aunt may have been schizophrenic. Counsel also presented the testimony of Bigby's private psychiatrist, Dr. Eudaly, as well as records from psychologist Dr. Koechel and records from hospitalizations and shock treatment that

22

occurred prior to the offense. (27 RR 115-70; DX 49 (records of Drs. Eudaly and Koechel); DX 50 (CPC Oak Bend Hospital records); DX 51 (St. Joseph Hospital records)). As trial counsel accurately explained:

> [T]he writ application seems to suggest that somehow whether Mr. Bigby was mentally ill was a hotly contested issue. In my opinion, there was not a soul in the courtroom that did not believe that Mr. Bigby was severely mentally ill at the time of the offense. There was ample and overwhelming evidence of Mr. Bigby's mental illness presented at trial. There may have been some dispute as to the extent and degree of his illness, and certainly a dispute regarding whether it mitigated such evidence as drowning an infant in a sink of water and securing a deadly weapon in the courtroom of his previous trial.

(4 SHR 720, 734). Counsel were aware of strengths and weaknesses in their case vis-a-vis the special issues. Counsel conducted a reasonable investigation. *E.g., Martinez v. Dretke*, 404 F.3d 878, 885-86 (5th Cir. 2005) (holding that counsel's reliance on information gained during first trial, plus additional investigatory efforts into defendant's mental health records, family members, and expert psychiatric assistance was a reasonable mental-health investigation). Given what defense counsel knew about Bigby's benign prison record and his mental status, their decision to first pursue a negative future-dangerousness finding and then to focus mitigation efforts on Bigby's mental health at the time of the offense, was objectively reasonable.

### 1. Dismissal of Mitigation Specialist

Nevertheless, Bigby maintains that counsel should not have dismissed mitigation specialist Shelli Schade, who could have prepared a more comprehensive investigation and could have testified. Counsel removed Schade because they were dissatisfied with her work, which they described as "nothing short of abysmal." She also tried to weigh

23

in on mental-health issues for which she was not qualified, and she did not have a good rapport with Bigby.  (4 SHR 719, 732-33). Schade's emails confirm that she did try to weigh in on the competency issue.  (2 SHR 256, 262, 266-67).  Dr. Goodness's notes and counsel's email to Schade confirm that Bigby refused to see Schade because she "baited him out" and promised him an audience with the judge, which she could not deliver.  (2 SHR 262; 4 SHR 835).

Bigby points out, however, that counsel asked Schade to speak with Bigby about whether he should testify when Bigby refused to speak with anyone else.  (*Petition* at 62; 2 SHR 251, ¶ 19).  The record reflects that Schade did speak to Bigby in mid-trial about whether to testify, (28 RR 115), but this fact does not undermine counsel's prior decision to dismiss Schade.  The record contains abundant evidence of Bigby's difficult and, at times, manipulative behavior.[6]  Trial counsel stated in an email that Bigby simply chose not to cooperate when it suited him.  (2 SHR 262).  Bigby refused Schade's visits before trial and initially refused to see Dr. Goodness as well.  (2 SHR 255-56, 262).  Schade's efforts to speak with Bigby about testifying were ultimately "futile."  (*Petition* at 62.)  Under these circumstances, Bigby's insistence on speaking to Schade and only Schade, if

---

[6]4 SHR 723, 739; 2 RR 4-37 (motion for self-representation); 4 RR 24 (objection to counsel's motion in limine); 4 RR 44-45 (objection to State's expert); 4 RR 47; 5 CR 591; 6 CR 724-28 (declarations of conflict with counsel); 4 RR 52-53 (admonishment that Bigby stop speaking out of turn); 25 RR 92, 106-07 (calling witness a liar); 28 RR 134-36 (Larry Moore's testimony); 31 RR 56-75 (changing clothes and refusing to sit through trial); 7 CR 817 (motion to recuse).

true, is a reflection of Bigby's usual pattern of difficult behavior and not the quality of Schade's work as a mitigation investigator.

Counsel did not forego mitigation assistance after dismissing Schade, as Bigby contends. (*Petition* at 45.)  Dr. Goodness stepped in as the mitigation specialist, interviewing witnesses and reviewing voluminous records.  Bigby acknowledges that Dr. Goodness's profes-sional agency provides not only psychological services but mitigation services as well.  (*Petition* at 72.)  In fact, trial counsel attributed a previous client's life sentence to Dr. Goodness's mitigation work.  (4 SHR 718-19, 732).  Of course, given her additional role as a consulting, non-testifying mental-health expert, Dr. Goodness did not testify as a mitigation specialist.  But Bigby fails to clarify what Schade's testimony would have been.  And Bigby does not demonstrate that Dr. Goodness's dual role was outside the range of reasonable representation.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.4 cmt., p. 1003 (2003) (noting that counsel is free to allocate duties imposed by Guidelines to appropriate members of the defense team, with two exceptions that do not apply here).

### 2. Allegations of Overlooked Evidence

Bigby claims that the defense team overlooked additional evidence of his family's dysfunction and his risk factors for mental illness that would have resulted in a life sentence.  The record does not support these factual allegations.

Bigby asserts that counsel "may have" overlooked unidentified health records of his mother, but this claim is based on speculation that such records existed and would have been helpful to the defense. (*Petition* at 60.)  Bigby's claim that his mother drank alcohol during her pregnancy with him, possibly affecting his development, is also not supported by his evidence.  *Compare Petition* at 47 *with* 2 SHR 274 (Ronald Blevins' affidavit stating that his mother frequently drank beer *after* Bigby was born, leaving Bigby unsupervised).  Bigby's claim that counsel failed to obtain the psychological and/or institutional records of Jerry and Trudy likewise fails because Bigby did not produce any evidence of those records.  Knox's summary of their contents was stricken as hearsay.  (4 SHR 908-09).  Furthermore, Bigby's "abandonment" theory is undermined by the fact that Bigby was the one child his mother did *not* give away and by the testimony of Bigby's father, who indicated that he visited his son once or twice a week after separating from his wife.  (27 RR 58).

To the extent Bigby alleges counsel overlooked the witnesses interviewed during the state habeas investigation, there is little evidence of what their testimony would have been and no evidence that they would have been willing to testify.  (4 SHR 915).  Ineffective-assistance claims based on uncalled witnesses must show that their testimony would have been favorable and that the witness would have testified at trial.  *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Knox's report reflects that Bigby's brother Jerry "is fearful of

James and does not want to take a chance of being called into court."
(2 SHR 202). Bigby's 1987 deposition in the Frito-Lay lawsuit
confirms the "bad blood" between them and the fact that they did not
"see eye to eye on anything," further undermining the likelihood that
Jerry would have testified. (SX 108, p. 20). Bigby's half-brother,
Ronald, stated that he does not have a good relationship with Bigby
and has had no contact with him for many years. Ronald's affidavit
contains no statement regarding his willingness to testify. (2 SHR
274). A cousin named Susan Black did not provide an affidavit, and
Knox's memorandum of what she said was stricken by the state court as
hearsay. (2 SHR 284; 4 SHR 908, ¶ A(2)). Similarly, Knox's summary
of an interview with Ronald's ex-wife, Judy Pogue, indicates that
Pogue "did not want to help James particularly, but was willing to
give information about his family"; Knox's memorandum of Pogue's
interview was stricken as hearsay. (2 SHR 292; 4 SHR 908, ¶ A(2)).
Bigby's uncle, Marvin Bigby, likewise did not provide an affidavit,
and the memorandum of his interview, also stricken as hearsay,
indicates he was "not willing to do anything that will be helpful to
James." (4 SHR 682, 908, ¶ A(2)). An affidavit provided by former
sister-in-law Jerita (Arthur's ex-wife) was stricken in part as
hearsay and contains no statement concerning her ability or desire to
have testified at trial. (4 SHR 684, 908, ¶ A(3)).

Even assuming that these additional records and witnesses were
available at the time of trial, a reasonable attorney would not
necessarily have presented them to the jury. As Bigby acknowledges,

27

his attorneys were in possession of his mother's medical records, which were obtained by original counsel in 1991. (*Petition* at 59-60.) Counsel also knew that Bigby's mother was an alcoholic who had abandoned her other children and who did not have much success in life. Counsel knew about the "twisted" nature of Bigby's relationship with his mother and descriptions of them as vindictive, angry, and bitter. (4 SHR 857-58, 860-61). But, as counsel explained, "In my opinion, the mental health status of various family members is really only important when there is a dispute regarding whether the defendant is in fact mentally ill." (4 SHR 720, 734). Counsel did not face the difficulty of presenting a diagnosis for the first time at trial, which jurors may suspect is manufactured. (4 SHR 720, 734). Counsel believed that evidence focusing on Bigby's genetic predisposition toward mental illness would not have been an effective strategy in this case because, in their experience, the State would compare Bigby to his mentally ill relatives who were not out "drowning infants or killing people." (4 SHR 720, 734-35, 858, 860, 918-19).

Likewise, counsel did not believe that evidence of family dysfunction would have been mitigating, even though it may have contributed to Bigby's mental illness, as Bigby was the only family member who became a capital murderer. (4 SHR 721, 735-36, 858, 861). To the extent the witnesses would have shown the dysfunction in Bigby's family, counsel believed this sort of evidence would show only that "James comes from a long line of angry, mean people who do bad things, other than the fact that none of them drowned a baby." (4 SHR

28

858, 860).  This was an objectively reasonable belief on counsel's part.  *See, e.g., Woods v. Thaler*, 399 Fed. Appx. 884, 897 (5th Cir. 2010) (stating that evidence of a genetic predisposition to mental disease may undermine counsel's efforts to prove the defendant would not be a future danger).

### 3.  Counsel's Presentation

Bigby asserts that counsel's presentation overlooked other theories and devices that should have been employed at trial.  For example, he states counsel should have argued that he had a serious substance-abuse problem that was never properly treated during his hospitalizations. (*Petition* at 62-63.) The state court rejected this contention, however, because it is unsupported by evidence of an expert opinion.  (4 SHR 921).  Additionally, the Fifth Circuit has long denied claims of ineffective assistance based on counsel's tactical decision not to present "double-edged" evidence such as drug abuse.  *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003). Counsel could have reasonably decided that linking Bigby's offense to volitional, untreated drug abuse would have been unwise because it undermined their theory that Bigby had been off drugs well before the murders and that the murders were a result of mental illness. (33 RR 84-86).

Bigby argues that counsel should have used a genogram to explain that Bigby chose Christmas Eve to act because his mother injured her leg around Christmas Eve, and she often became depressed and suicidal

around Christmas.   Trial counsel believed that this genogram, a timeline extending back to 1888, largely comprised of "so and so begat so and so," would have been of no assistance to the defense.   (4 SHR 721, 736; 2 SHR 171).   Bigby also contends counsel should have presented the argument that choices were made for Bigby before he was capable of making choices for himself.   (*Petition* at 62-68.)   The state court rejected these and other proposed ideas for humanizing Bigby, such as  demonstrating Bigby's mental anguish over his lifetime, offering photographs of Bigby, and showing Bigby's inability to control his behavior and learn from his mistakes.   (4 SHR 919, 921-22).

There are countless ways to effectively represent a capital defendant.   *See Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*). Counsel here believed that their strongest chance of saving Bigby's life was to show his lack of propensity for future dangerousness "rather than a shotgun approach of throwing things against the jury box to see what might stick with no plan or consistency in mind."   (4 SHR 723, 739-40).   While Bigby proffers alternative theories that counsel could have presented, mere disagreement with counsel's strategy will not satisfy the *Strickland* standard of unreasonable performance.   *See Pape*, 645 F.3d at 291 (concluding court may not, in hindsight, second-guess counsel's strategy merely because an alternative course of action existed during trial); *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).   The question is not whether there were other strategies available but whether the chosen strategy was

objectively reasonable, keeping in mind that not all cases will benefit from a defense focused on humanizing the defendant.[7] *See Van Hook*, 130 S. Ct. at 17 (emphasizing that the Constitution imposes one general requirement: that counsel make objectively reasonable choices).

Assuming the truth of Bigby's factual claims, his angry, alcoholic, and disabled mother was not the ideal parent. But he was raised with his grandparents in their home and he maintained regular contact with his father. (2 SHR 203; 27 RR 58). Bigby contends his teenage years lacked structure and rule enforcement and that his mother and grandparents had "limited financial resources," but there is no evidence that he lived in poverty or was physically or sexually abused. (2 SHR 204-05). Although he did not graduate from high school, Bigby's chosen lifestyle did not require a high-school diploma. With his average intelligence, he earned a GED in prison. (2 SHR 209-10). Experienced counsel could have reasonably decided that the jury would be unimpressed with an attempt to humanize Bigby on account of these childhood circumstances. *Cf. Wiggins*, 539 U.S. 535 (reciting "powerful" overlooked mitigation evidence of severe privation and abuse while in care of an alcoholic, absentee mother;

---

[7] As the chief judge of the Ninth Circuit has observed: "The current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it. Not all defendants are capable of rehabilitation, and not all juries are susceptible to such a plea." *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting), *rev'd sub nom.*, *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

physical torment, sexual molestation, and repeated rape while in foster care; periods of homelessness; and diminished mental capacities).

### 4.  Bigby's Decision Not to Testify

Finally, Bigby complains that counsel's plan to have him testify failed due to their inadequate preparation and a poor rapport. *Petition* at 62.  The record refutes Bigby's allegation that counsel planned for Bigby to testify.

In their affidavit, counsel state that they had a good rapport with Bigby, that he was very involved in his case, and that he wanted to testify but they recommended against it.  In the end, Bigby relied on counsel's advice and, "perhaps for some of his own reasons," decided not to testify.  (4 RR 723, 739).  The trial record supports counsel's recollection.  Bigby stated under oath that he was aware of his right to testify.  He decided, after praying for an hour and a half and speaking with counsel, as well as Shelli Schade, that God did not want him to testify.  (28 RR 115-16).  Bigby reiterated his decision at the end of the trial.  (33 RR 51-52).

Bigby's present opinion to the contrary notwithstanding, the state court's rejection of this claim was not unreasonable.  (4 SHR 920-21); *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984) (attaching no weight to the client's "expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction").

5.   Conclusion

Bigby's argument boils down to whether counsel investigated enough and presented enough evidence relating to Bigby's upbringing and mental-health history.   This Court must be particularly wary of these types of arguments, which essentially come down to a matter of degrees and are "even less susceptible to judicial second-guessing." *See Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).   Counsel presented, but did not emphasize, evidence of Bigby's childhood and possible genetic disposition to mental illness because counsel otherwise had strong proof that Bigby was mentally ill at the time of the offense, and the State would have simply pointed out that none of Bigby's family members committed capital murder.   Such tactical decisions are objectively reasonable and do not amount to deficient performance within the meaning of *Strickland*.   *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 185 L.Ed.2d 190 (2013) (upholding the district court's decision that, inter alia, petitioner's trial counsel reasonably could have decided that a mitigation defense would be a double-edged sword and that the best chance to save petitioner's life was to try to persuade the jury that petitioner would not be a future danger if imprisoned for life); *see also Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (holding that evidence of abusive, violent upbringing, or abuse of alcohol and drugs can be double-edged and a tactical decision not to "humanize" defendant with such evidence would not be deficient performance).

33

Bigby fails to demonstrate that the state court's finding against
deficient representation was unreasonable.

### E.   Assessment of Prejudice

The state court concluded that the mitigating evidence presented
in the habeas proceeding was relatively weak and the aggravating
evidence "extensive and compelling," such that there is no reasonable
probability that the jury, if confronted with the new evidence, would
have sentenced Bigby to life imprisonment rather than death.  (4 RR
928-29).   Bigby fails to demonstrate that this conclusion was
unreasonable.

Bigby's background and mental state were well developed at trial,
such that the information collected for habeas review duplicates in
large part the body of evidence received by the jury.  For example,
information regarding Bigby's paranoia, delusions, depression,
psychosis, drug use, childhood circumstances, and mentally disabled
mother and aunt was presented through the testimony of his father,
three former attorneys, a hospital worker, his treating psychiatrist,
the medical director of the county jail, two court-appointed
psychiatrists, a prison chaplain, and voluminous medical and prison
records.  Because the nature of this offense involved the inexplicable
murder of three apparent friends, Bigby's background and mental status
were further developed by State's witnesses, including the wives of
Trekell and Johnson, and seven men and three women who knew Bigby
during childhood and young adulthood.   Bigby's former wife also
testified for the State.

34

Moreover, some of the new habeas information is of questionable value to the defense. Half-brother Ronald indicated that he became estranged from his mother in part because Bigby used Ronald's identification when he was stopped by the police, causing Ronald to be arrested, and their mother wanted Ronald to take the blame. Ronald describes another time when his grandmother asked him to come to her house because she was afraid and intimidated by Bigby, who had a friend staying in her house. The friend was the brother of the man who, ten years later, would help Bigby cut down the shotgun used to kill Frank "Bubba" Johnson. (2 SHR 274; 30 RR 32).

Bigby's Uncle Marvin told Knox that "anyone that had killed four people and one of them was a baby deserves to die," and "[Bigby] was tried twice and sentenced to death two times and it should just be carried out." (4 SHR 682). Jerita O'Neal's affidavit discussed the unhappy childhood of Bigby's older half-brother, Arthur, whom Jerita married after the murders occurred, and Arthur's sister, Trudy. (4 SHR 684-86). It relates no mitigating information about Bigby, but describes **Arthur's** abandonment and the hurt Arthur felt when his mother carried on with her new family, i.e., Bigby's family. Bigby's cousin, Susan Black, described the "bad attitude" of Bigby's mother, who blamed the world for her problems and believed the world owed her something, as an attitude that Black later observed in Bigby. (2 SHR 284). The interview of Ronald's ex-wife indicates that Bigby's mother favored Bigby among her children and yet Bigby would on occasion throw his disabled mother's crutches out of reach--information remarkably

35

similar to the "wing nut" testimony that Bigby hotly disputed at trial.  (2 SHR 293; 31 RR 57-59).

Further, there is no evidence of prejudice resulting from Bigby's failure to testify because he does not identify the content of his would-be testimony or demonstrate how it would have affected the trial.  *See Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) (observing that prejudice element cannot be satisfied where petitioner fails to explain what his testimony would have been).

Against the body of mitigation evidence weighs the murder of four people, one a helpless infant.  Trekell was disabled, having lost the use of his right arm.  (23 RR 27).  Bigby told Dr. Coons that he "sat down a while" after killing Trekell and before deciding to smother Jayson with cellophane and then drown him, indicating that the child's murder was not an impulsive act.  (32 RR 70).  Trekell's wife, who came home from work on Christmas Eve to find her husband and infant son dead, testified that she has never remarried or had other children.  (23 RR 4).  Wesley Crane's son testified that his father had taken him Christmas shopping earlier on the day he died and that he very much misses his dad today.  (23 RR 126-29).  Frank "Bubba" Johnson's wife had been wrapping Christmas presents and cleaning the house for company before going to bed at midnight on the day before Christmas Eve.  (23 RR 159).  She, her husband, and her son were in their beds when the doorbell rang at 3:30 a.m., and she heard her husband get shot after he answered the door.  She never again lived in the house, which was sold in foreclosure.  (23 RR 159-63).

Bigby planned these murders and carried them out through trickery and surprise.  He was thirty-two years old and had a long, diverse criminal career.  He was a full-time thief who had already served two prison sentences.  There were many examples in the record of his enthusiasm for revenge and his utter disregard for the rights of others, including his own mother.  When arrested, an arsenal of legal and illegal weapons and ammunition was found in his motel room.  If this history and a quadruple homicide were not enough, during his first trial Bigby retrieved a loaded pistol from the judge's bench and attempted to kidnap the judge at gunpoint.

Given the circumstances of the offense, the considerable aggravating evidence, the double-edged nature of the psychological evidence and drug use, and the moderate evidence of childhood difficulties, Bigby has not demonstrated a reasonable probability of prejudice due to counsel's alleged deficient investigation and presentation.  *See Woods*, 399 Fed. Appx. at 897 (finding no prejudice given the great amount of aggravating evidence and double-edged nature of neuropsychological evidence).  The totality of available mitigating evidence, when weighed against the aggravating evidence, is not sufficient to undermine confidence in the trial outcome.  Bigby fails to show that the state court's ruling was unreasonable, and claims 1 and 2 are denied.

## IV.   Counsel's Representation in Voir Dire (claims 3A-L)

Bigby next asserts that counsel rendered ineffective assistance by failing to adequately question potential jurors about the

37

mitigation special issue.   Bigby appears to contend that counsel's allegedly insufficient mitigation investigation *per se* resulted in counsel's failure to conduct meaningful void dire examination on the subject of mitigation.   (*Petition* at 79-83.)   Bigby fails to identify any specific question unasked by counsel that a reasonable attorney would have asked, however.   Bigby also fails to allege how he was prejudiced by counsel's examination of the potential jurors.   Absent a specific showing of how the alleged error was constitutionally deficient and how it prejudiced Bigby's right to a fair trial, the Court can find no merit to the claim.   *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (clarifying that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

Bigby seems to suggest that if counsel had known about the evidence gathered by Toni Knox during the habeas investigation, he would have been able to question the venire in a way that allowed him to select a jury predisposed to accepting such evidence. (*Petition* at 81-82.)   But jurors are not required to consider a particular type of evidence to be mitigating.   *Standefer v. Texas*, 59 S.W.3d 177, 181 n.17 (Tex. Crim. App. 2001) (citing *Raby v. Texas*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998)).   In fact, questions asking whether the potential jurors could consider particular types of evidence to be mitigating would have been improper under Texas law.   *Standefer*, 59 S.W.3d at 181 (stating that "where the law does not require a commitment, a commitment question is invariably improper"); *e.g.,*

38

*Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir. 2000).  Bigby presents no authority that counsel is ineffective for failing to ask mitigation-related questions in voir dire.

To be clear, Bigby does not contend that his counsel allowed the seating of a juror who was unconstitutionally biased against the mitigation issue and thus subject to removal for cause.  *See Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007)(citing *Wainwright v. Witt*, 469 U.S. 412 (1985)).  In this regard, the Court notes that both the prosecutor and trial counsel propounded questions calculated to assess the potential jurors' qualifications under *Wainwright*, and none of the empaneled jurors demonstrated an impaired ability to consider mitigation evidence.  *See* 5 RR 31-32, 77-79 (Walker); 7 RR 23, 52 (Kinnear), 73-76, 95-96, 98 (Kindred), 160-61, 181-83 (Templin); 10 RR 29-30, 50-52 (Lobstein), 84-85, 121-22 (Laurent); 11 RR 117-18, 147 (May); 15 RR 131-32, 149-51 (Guzman); 16 RR 84-88, 123 (Stewart), 153-54, 180-81 (Sampson); 19 RR 27-33 (Lawson); 22 RR 103-05, 121-23(Ward).

Bigby fails to demonstrate that the state court's rejection of this claim was unreasonable.  (4 SHR 929-30).  Claim 3 is denied.

## V.   Evidence of Future Dangerousness (claim 5)

In claim 5, Bigby challenges the sufficiency of the evidence to support the jury's answer to the future-dangerousness special issue. *See supra* at 18.  Respondent contends the claim is barred in federal court because the state habeas court barred the claim based on an adequate and independent state procedural rule.  *See Coleman v.*

*Thompson*, 501 U.S. 722, 731-32 (1991) (holding that federal habeas courts generally will not consider the merits of a claim resolved by state courts on a state-law ground that is both independent of the federal question and adequate to support the judgment). Respondent also maintains that the state habeas court's alternative holding rejecting the claim on the merits was not unreasonable under § 2254(d).

The state habeas court concluded that the insufficiency claim was not cognizable and should be denied under *Ex parte Pareles*, 215 S.W.3d 418, 419-20 (Tex. Crim. App. 2007) (differentiating a "no evidence" claim, which is cognizable, from an insufficiency claim, which is not). (4 SHR 936). *See also Ex parte Grigsby*, 137 S.W.3d 673, 674 (2004) (stating that a challenge to the sufficiency of the evidence is one of those instances where the court can never consider the merits of the habeas applicant's claim). The failure to comply with this Texas requirement to present a sufficiency-of-the-evidence claim on direct appeal rather than habeas review is an adequate state ground to bar federal review. *See Coleman v. Quarterman*, 456 F.3d 537, 546 (5th Cir. 2006); *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994). Bigby does not argue any cause and prejudice or manifest injustice to excuse the procedural default. *See Coleman*, 501 U.S. at 750. Accordingly, federal habeas review of this claim for relief is barred. *Renz*, 28 F.3d at 432.

The state habeas court also conducted an alternative analysis of this claim on the merits, citing Texas authority that relies on

*Jackson v. Virginia*, and concluded that the evidence was sufficient and relief should be denied.  (4 SHR 936).[8]  Under *Jackson*, evidence is sufficient to support the jury's affirmative answer to the future-dangerousness issue if, viewing the evidence in the light most favorable to the verdict, any rational juror could find the elements of the issue beyond a reasonable doubt.  See *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Martinez v. Johnson*, 255 F.3d 229, 244 n. 21 (5th Cir. 2001) (noting that the Texas Court of Criminal Appeals applies the *Jackson* standard to evaluate the sufficiency of future-dangerousness evidence).  This federal *Jackson* standard is used to determine if the amount of evidence satisfies the Due Process clause, while state law determines the substantive elements that must be proven.  *See Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (assessing evidence of guilt); *e.g., Miller*, 200 F.3d at 286 (assessing evidence of future dangerousness).  Factors that inform a jury's future-dangerousness determination in Texas include: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was

---

[8]The fact that the state court alternatively reached the merits does not vitiate the independent and adequate state procedural bar.  *See Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The state-court decision rejecting Bigby's insufficiency challenge may be overturned on habeas review only if the decision was objectively unreasonable. *See Johnson*, 132 S. Ct. at 2062.

The state court's findings recount Bigby's "murderous rampage" against three of his friends and an infant, his matter-of-fact and sarcastic demeanor during his police confession, the arsenal of weapons in his possession at the time of arrest, his attempt to kidnap his first trial's judge, the conflicting evidence about the cause and diagnosis of his psychological problems, his thoroughly criminal lifestyle, the evidence of his desire to seek revenge, and his having complied a list of other people he wanted to kill. (4 SHR 931-36). These findings are supported by the trial record, which the Court has reviewed extensively. The facts and circumstances are sufficient to support the jury's affirmative finding of future dangerousness, even in light of the evidence that Bigby had been incarcerated previously without serious incident. *See Devoe v. State*, 354 S.W.3d 457, 461-66 (Tex. Crim. App. 2011) (finding sufficient evidence of future dangerousness in multiple-murder case despite "almost pristine" behavioral record in prison); *Robertson v State*, No. AP-71,224, 2011 WL 1161381, at *1-2 (Tex. Crim. App.), *cert. denied*, 132 S. Ct. 844 (2011) (not designated for publication) (finding evidence of future dangerousness sufficient in double murder, despite defendant's

spending eighteen years on death row with no violent infractions). The state court's ruling on the merits is not an unreasonable application of the *Jackson* standard.

Based on the foregoing, federal habeas relief is barred under *Coleman v. Thompson* and, in the alternative, precluded under § 2254(d)(1).  The Court denies claim 5.

## VI.   <u>The Texas Death Penalty Statute (claims 4, 6, 7)</u>

Claims 4, 6 and 7 challenge the constitutionality of the mitigation special issue in the Texas death-penalty statute.  See Tex. Code Crim. Proc. Ann. art. 37.0711, § 3(e); *supra* at 18, fn. 3.  These claims were all rejected by the state court on either direct appeal or habeas review.  (4 SHR 930-31, 937-38).  They are all foreclosed by Fifth Circuit precedent.

### A.   Claim 4

In claim 4, Bigby alleges error under *Apprendi v. New Jersey* because the mitigation issue implicitly places the burden of proving mitigation on the defendant and because the indictment does not provide notice of the death-qualifying facts that the state intends to prove.  *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The opinion in *Apprendi* held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *See Apprendi*, 530 U.S. at 490.

Respondent asserts, correctly, that *Apprendi* does not control the pleading and proof requirements for the mitigation issue because the

43

mitigation issue is not an aggravating factor that increases punishment beyond the prescribed statutory maximum authorized by the jury's verdict. Fifth Circuit precedent forecloses relief. *See Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Claim 4 is denied.

## B. Claim 6

In claim 6, Bigby relies on Justice Blackmun's dissent in *Callins v. Collins* for his contention that the mitigation issue gives the jury unfettered discretion to decide what evidence is mitigating and whether the defendant should live or die, in violation of the Eighth Amendment. *Petition* at 95; *see Callins v. Collins*, 510 U.S. 1141, 1143 (1994) (Blackmun, J., dissenting). Respondent maintains that the jury discretion and guidance provided by Texas special issues have been upheld by the Supreme Court and, alternatively, that Bigby is asking the Court to recognize and apply a new constitutional rule of criminal procedure in violation of *Teague v. Lane*, 489 U.S. 288, 310 (1989).

The claim is foreclosed by *Teague* because the Supreme Court has never adopted the minority view in *Callins v. Collins*. *See Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005). Alternatively, the claim lacks merit because the Supreme Court has held that juries may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is eligible to receive it. *See Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). And the Supreme Court has implicitly approved of the Texas mitigation

44

issue in particular as an adequate vehicle for the consideration of all mitigating evidence.  *See Penry II*, 532 U.S. at 803.  Claim 6 is denied.

### B.   Claim 7

In claim 7, Bigby contends the mitigation issue sends the jury unspecified "mixed signals" regarding the burden of proof and suffers from the same Eighth Amendment flaw as the judge-made "nullification" instruction struck down in *Penry II*.  In *Penry II*, the flawed nullification instruction required the jury to give a *false* answer to one of the special issues in order to give effect to its belief that mitigating evidence warranted a life sentence rather than a death sentence.  *Penry II*, 532 U.S. at 802.  This mechanism injected an unconstitutional element of capriciousness into the sentencing decision, making the jurors' power to avoid the death penalty dependent on their willingness to elevate the nullification instruction over the verdict-form instructions.  *Penry II*, 532 U.S. at 800.

The mitigation issue in this case presents no concerns similar those identified in *Penry II.*  Moreover, as noted above, the mitigation issue was implicitly approved by the Supreme Court in *Penry II*.  Bigby fails to demonstrate that the state court's ruling was an unreasonable application of clearly established federal law, and claim 7 is denied.

### VII.   The Lethal Injection Protocol (claim 8)

In this final claim, Bigby contends that the lethal injection protocol violates the Eighth Amendment because it involves a foreseeable infliction of suffering.[9]  He states that the first drug administered, sodium thiopental, is a short-acting barbituate that may not provide a sedative effect throughout the entire execution.  If this happens, then the paralytic effect of the second drug, pancuronium bromide, will mask the excruciating torture caused by the third drug, potassium chloride, which is intended to cause cardiac arrest.  He also argues that the lack of physician involvement and training standards for execution personnel makes the risk of severe and unnecessary pain likely.

The state habeas court held, based on Texas precedent, that this issue was not cognizable on habeas review and also not ripe for review.  (4 SHR 938).  Respondent argues only that the claim is without merit because the protocol is substantially similar to the protocol that was upheld in *Baze v. Rees*, 553 U.S. 35 (2008).  Because there is no state-court decision on the merits, this Court reviews the claim *de novo* rather than through the deferential lens of the AEDPA.  *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

Fifth Circuit precedent forecloses relief.  The three-drug procedure challenged by Bigby is within the safe harbor established by *Baze v. Rees* because it does not create a demonstrated risk of

---

[9]The Court understands that the protocol challenged by Bigby is not presently used for Texas executions.  *See* Tex. Dep't Criminal Justice – Corr. Inst. Div., *Execution Procedure*, ¶ VII (July 9, 2012) (establishing single-drug protocol). Nevertheless, this is the claim that is raised and briefed by both parties.

severe pain.  *See Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (affirming summary judgment for the State in § 1983 challenge to execution protocol); *see also Rivas*, 432 Fed. Appx. at 405 (holding that *Raby* forecloses Eighth Amendment challenge to the three-drug protocol).  The Court denies claim 8.

## VIII.   Request for Hearing

Bigby requests a hearing on his claims because the state habeas court ruled too quickly that there were no controverted, previously unresolved factual issues that required a live hearing.  Specifically, Bigby complains that the trial court denied a hearing 46 days after the State's answer was filed and 4 days after the last supplemental affidavit of trial counsel was filed, which was not enough time to review all the pleadings and exhibits.  Bigby also complains that the convicting court adopted, in total, the State's proposed findings of fact and conclusions of law.  He maintains that the state court therefore did not "reliably find the facts after a full hearing" and that he is entitled to a hearing in this Court.  *Petition* at 22-24, 76.

This Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2).[10]  *Landrigan*, 550 U.S. at 473.  In

---

[10] Section 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

    (A) the claim relies on—
        (i) a new rule of constitutional law, made

exercising that discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief. *Landrigan*, 550 U.S. at 474. The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief. *Id.* In practical effect, if the state-court record precludes habeas relief under the limitations of § 2254(d), a federal district court is not required to hold an evidentiary hearing. *Id.*; *Pinholster*, 131 S. Ct. at 1399.

Bigby failed to demonstrate that the state-court rulings on claims 1 through 7 were unreasonable. Habeas relief is therefore precluded by § 2254(d), rendering a hearing on those claims inappropriate. *See Pinholster*, 131 S. Ct. at 1400-01. Claim 8 is foreclosed by circuit precedent, and Bigby fails to allege any facts that, if true, would entitle him to relief on that claim. Therefore, a hearing would be inappropriate for claim 8 as well.

Bigby argues, however, that the state proceeding was not a "full hearing" as required by *Townsend v. Sain*, 372 U.S. 293 (1963). The

---

retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

vitality of *Townsend* after the AEDPA and *Pinholster* is questionable. *See Valdez v. Cockrell*, 274 F.3d 941, 949 (5th Cir. 2001) (stating that the AEDPA "jettisoned all references to a 'full and fair hearing' from the presumption of correctness accorded state court findings of fact, along with the other situations which previously swept aside the presumption"); *Brumfield v. Cain*, 854 F. Supp. 2d 366, 374-75 (M.D. La. 2012). That aside, Bigby provides no authority, either before or after AEDPA, for his claim that 46 days is *per se* insufficient for the trial judge to review the briefing and evidence related to eight habeas claims. In fact, Bigby fails to show record support for his assumption that the trial judge waited until the State's answer was filed before she began reading the application itself.

The Texas statute governing death-penalty writs required the convicting court to make its hearing determination no later than 20 days after the State's answer is filed. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 8(a) (West 2012). This suggests that Texas trial judges are encouraged to read the application when it is filed, so that the writ process may be "speedy and effective." *See also Ex parte Brooks*, 219 S.W.3d 396, 399 (Tex. Crim. App. 2007) ("The purpose of the Habeas Corpus Reform Act of 1995 was to fulfill the Texas Constitutional mandate requiring a speedy and effective habeas corpus remedy") (citing *Ex parte Kerr*, 64 S.W.3d 414, 418 (Tex. Crim. App. 2002)). Here, the trial judge had a full six months to contemplate Bigby's habeas allegations before receiving the State's answer and deciding whether a hearing was warranted.

Bigby also fails to support his claim that the state court may not adopt the State's proposed findings and conclusions as its own. The Fifth Circuit has rejected the contention that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Green v. Thaler*, 699 F.3d 404, 416 n.8 (5th Cir. 2012) (citing *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) and *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995)). Nor can Bigby persuasively challenge the validity of paper hearings in state court, which have been consistently upheld in this Circuit. *Green*, 116 F.3d at 1120 n.4. As stated, the judge who heard Bigby's habeas application and recommended the denial of relief to the Texas Court of Criminal Appeals was the same judge who had presided over the 2006 retrial. She was already familiar with the case, the evidence, and arguments, as well as the attorneys and their credibility. She was uniquely qualified to assess whether a live evidentiary hearing was necessary under the circumstances. The trial judge's denial of an evidentiary hearing and her reliance on the State's proposed findings of fact and conclusions of law do not render the state-court rulings unreasonable. *Id.* The Court denies the request for a hearing.

## IX.  Certificate of Appealability

Under Federal Rule of Appellate Procedure 22(b), Bigby cannot appeal this order unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253(c). Rule 11(a) of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA when it enters a final order adverse to the applicant.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *See* § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Where a district court has rejected the constitutional claims on the merits, a petitioner satisfies this standard by showing that reasonable jurists would find the district court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Where the district court dismisses the petition on procedural grounds, a petitioner satisfies this standard by showing that reasonable jurists would find it "debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether the district court was correct in its procedural ruling." *Id.*

Upon review and consideration of the record and the pleadings, the Court determines these standards have not been met.  Accordingly, the Court **DENIES** a certificate of appealability.  In the event Bigby files a notice of appeal, the Court notes that he may proceed *in forma pauperis* on appeal.  *See* 18 U.S.C. § 3006A(d)(7).

The Court **DENIES** the application for habeas relief.

SIGNED April 5, 2013.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/ks:bb